CHARLES S. ALBEE

*v.*

MARY W. ALBEE.

*Filed at Ottawa May 12, 1892.*

1. DIVORCE—*willful desertion—what constitutes.* The refusal of a wife to live in the house of her husband's parents, on the ground of mistreatment by her mother-in-law, who has no friendly feelings toward her, when the wife, by all her declarations and conduct, shows affection for her husband and a willingness to live with him anywhere else, can not be said to constitute that willful desertion required as a ground of divorce.

2. SAME—*desertion as cause for divorce—must be continuous for two years.* However willful the desertion may be, and however destitute of reasonable cause, it is no ground for a divorce unless continued for the space of two years. At any time within that period the offending party has the right to put an end to it, and when that is done no cause of divorce has accrued. If at any time during the two years the party deserting, in good faith and with an honest intention to resume marital

relations, returns or offers to return to the party deserted, the continuity of the desertion is broken.

3. SAME—*right of wife or husband to return after desertion—effect of refusal to permit a return.* Nor can the deserted party prevent this by refusing to receive back and to resume marital relations with the other. He or she can not, because the other has taken a position, however willful and causeless it may have been, hold him or her to it. For two years the door for repentance must be kept open, and if it is closed and barred when an offer to return is made in good faith, not only is the desertion terminated, but the circumstances may be such as to reverse the legal attitude of the parties, and constitute the party originally offended against, from that time forth, the offender.

4. Where a wife, for several months after her alleged desertion of her husband, made repeated and persistent efforts to return to him, but without success, he sometimes shunning her, at other times ignoring her presence, and wholly failing if not directly refusing to receive her back or to allow her to live with him as his wife, her desertion will cease from the time of such offer to return.

5. RESIDENCE—*prima facie proof of residence.* A husband came to this State a little more than two years before filing his bill against his wife for divorce, as he testified, with the intention of becoming a resident, and that such had been his intention ever since. During a part of that time he was absent on visits to his former home, and he testified, and was not contradicted, that such visits were all for temporary purposes, and that his residence during the whole time was in this State : *Held,* that his testimony was sufficient to make out a *prima facie* case of a residence in this State.

6. COSTS—*additional abstract.* Where an appellant in the Appellate Court, on reversal, is allowed the cost of preparing his abstract of the evidence, a copy of which he files in this court on appeal by the unsuccessful party below, he will not be allowed the cost of an additional abstract because of the deficiency of the abstract of the other party appealing.

APPEAL from the Appellate Court for the First District ;— heard in that court on appeal from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

This was a bill in chancery, filed September 23, 1890, in the Superior Court of Cook county, by Charles S. Albee against Mary W. Albee, for a divorce, on the ground of desertion. The defendant appeared and answered, and a replication being

filéd, by agreement of the parties, a jury was waived, and the cause was submitted to the court for a trial. A hearing was thereupon had on pleadings and proofs, resulting in a finding of the issues in favor of the complainant, and the entry of a decree in accordance with the prayer of the bill. On appeal by the defendant to the Appellate Court of the First District, said decree was held to be unsupported by the evidence, and a judgment was entered reversing said decree and ordering the bill to be dismissed for want of equity. From said judgment of reversal, the complainant has now appealed to this court. The opinion of the Appellate Court, in which the facts disclosed by the record are stated, is as follows:

"MORAN, J.: We have examined with care the evidence in this case, and have come to the conclusion it does not warrant the decree entered in the court below. The bill is filed for divorce on the ground of desertion. The evidence shows that the parties were married at Bellows Falls, Vermont, in October, 1885. At the time of the marriage appellant was running a small millinery store at Bellows Falls, and appellee, who was the only child of his parents, was working on the farm of his father, and living with his father and mother on said farm, a few miles from Bellows Falls. After the marriage the young couple went to live in the house with his parents, though the wife continued her business at Bellows Falls, going back and forth every day. As is not unusual in cases where the son brings his wife to his mother's house to live, the daughter-in-law and mother-in-law did not get along pleasantly, and appellant sought to induce her husband to take rooms in the village and live there, and offered to pay for them herself. This, he says, he was ashamed to do, and leave his good home. She testified that she suggested to him that his father might build a home for them, and pointed out a place on the land where it could be built, and he said that his father was willing to do it, but his mother said no, there

should be no other house built, — that if the house was not large enough for appellant she could get out and leave it.

"In March, 1886, they talked about going to some other place to live. She wanted to go to Rutland, and persuaded him strongly to go. He was reluctant, and testified that he did not consent to her going,.but she swears that he did consent to her going and promised to go with her. It is agreed by both that he took her to the depot one Saturday when she started to Rutland, and that he packed up her goods and furniture and brought them to Rutland, where he went on the following Thursday and joined appellant, and lived with her at her father's house. He obtained employment in Rutland and remained there, living with her, till June 28, when he went home to his father's. He testifies that he wanted her to go back with him to live there, but her story is that he told her that his people wrote him that they were lonely and sick, that he was out of work in Rutland, that he thought he would go and help his father through haying, and asked her to come over after the fourth of July and spend the vacation, when the busy season in her business was over. It was agreed by both of them that she did follow about July 4, taking with her merely some dresses to wear, but no furniture, and that she remained living with him at his father's for some five weeks. She returned in August, and shortly thereafter he called for her at Rutland, and they went to Saratoga Springs, and then returned to his father's, where she remained living with him till about September 2. She testifies that his mother made it very unpleasant for her during this time. She would say to her that she thought she (appellant) would want to go back and attend to her business,—that if she stayed away from her business so long she would not know what would become of it. Some of the time the mother-in-law would not speak to her. If appellant came out on the porch where she was, she would leave and go inside.

"When appellant left to return to Rutland on September 2, 1886, appellee drove her to the depot. She testifies that when they were leaving, his father and mother were in the yard, and her husband asked her if she noticed that they did not invite her to come back. He said, 'I'll give mother hell for that.' She said, 'Don't, for my sake,' and he said, 'They can't treat you like that and have it go with me.' In his denial of this, on rebuttal, he contents himself with denying that he said he would give his mother hell. He says she left this time against his will. She says he consented, and was to come to Rutland to her. She testifies that he came to Rutland in September and said he would try to get work. This he denies, but both agree that he was there in October, on the anniversary of their marriage, and again during the same month when she was sick, and stayed some days living with her, and she says he told her he must go home, as his folks thought he was in Boston instead of Rutland, and that he promised her to return in two weeks and bring her back to the farm, where she says she consented to go. He says that he went to see her in October, but that he had a letter from her in September, (the contents of which he gave from memory, the letter being lost,) in which she told him if he wanted to see her he must come to Rutland, as she had left Bellows Falls for the last time.

"She wrote him several letters from October to December, 1886, which she says he received, but she says she received no replies to them, and he does not pretend that he wrote any. Fearing that he did not receive her letters, in December, the week before Christmas, she went to Bellows Falls and went to his mother's house and asked for him, and the mother said he was down at Russell's farm, and appellant went down there and saw him, and she asked him what he was doing there. She asked him why he had not answered her letters, and he said he had not time, and that he did not intend saying anything,—that he had said all he intended to. She testifies that he then said that he would come to the hotel for

her that afternoon and take her up to the house.   He did not come, and she remained at the hotel all night.   The next day, being Sunday, she sent a message to him at his mother's house, but his mother said he was not at home.   That Sunday evening appellant walked two miles to the farm where appellee was working, but his boss said he did not know where he was.   On Tuesday she went to his mother's house to see him, and his mother came to the door and said: 'Charley is not at home, and if he was I would not let him see you.  You have made trouble and we don't want to see you.'

"Appellant remained at the hotel for several weeks, waiting to see him, but he was away.   In January she learned that he was at Barry, ten or twelve miles away, and she went there and found him.   He wanted to know how she knew he was there.   She swears she asked why he did not come after her to Rutland, and he said he had changed his mind, and he had no place to take her to, 'only up home, and you don't want to go there.'   She said, 'I have not refused to go there.'   He said, 'They don't want you there now,—I don't think mother would have you there now.'   She further says that she never refused to live with him at his father's house, but she does not pretend to deny that she did not want to do so.   She swears that in this interview in January, 1887, she said to him that she would sell out her business and give the money to him so that he might provide a home for her.   He said: 'Is that an insult?  You have a good home and can stay there.'   She said: 'I left that home for you; I did not marry the home, I married you, and if I can't be with you I don't want to live.'   He said: 'Go home and stay, and when I am ready I will send for you.'   She said: 'I would live in your father's sheep-house if you will put the windows in.   I will live anywhere to be happy with you.'   He asked her if that was another insult.   She asked him to drive her back to Bellows Falls, but he said he had an appointment, but would come to the hotel at 7:30 and take her to his father's house, but he never came.   She

stayed about a week longer in Bellows Falls, but hearing noth-
ing from him returned to Rutland. He testifies that he was
informed by third parties that she was staying near Bellows
Falls in December; that he went to the Barry place on De-
cember 30, but did not go to avoid seeing her; that he saw
her when she came over in January, and that she wanted him
to go to Rutland, and came for that purpose. He said he had
no business at Rutland, but if she would come back to Bellows
Falls and live at his home, as per·agreement, they would be
on the road in five minutes.

"It is perfectly apparent from the record that the only sub-
ject of difference between these parties, at any time, was as
to the matter of their living in his father's house with the old
people. She loves her husband, and has evidently, by her
conduct, a strong desire to live with him instead of deserting
him. He finds no fault with her except that she would not
live at his home,—that is, with his father and mother. It is
undoubtedly true that she did not desire to live there, and did
all in her power to persuade him to live with her somewhere,
in fact, anywhere, else. She wrote the letter in September
that she had left Bellows Falls for the last time, as a means
of inducing him to find another home, but that she did not
mean by what she said to desert her husband is shown by her
conduct in December and January following. The particulars
of what preceded and followed the letter, and what occurred
at the time of her departure before the letter was written, are
important to be considered, and these preceding and attendant
circumstances negative the inference of an intention to desert.
Besides, it is not to be laid down as settled law that a wife
must live in the house of her mother-in-law or be divorced
from her husband for desertion.

"Much stress is laid on the fact that before the marriage she
agreed to live at his mother's house. Such an ante-nuptial
contract is of no force. All such promises are merged and·
obliterated by the marriage contract, which bound the hus-

band to 'leave father and mother and cleave to his wife.' It is proved that the house was large and comfortable, but his wife wanted more than mere space and convenience,—she wanted peace of mind and happiness, and was willing to live with him in his father's sheep-house in order to be happy.

"In *Powell* v. *Powell*, 29 Vt. 148, where a wife persisted in her refusal to live with her husband near his relations and he persisted that she should do so, that being the only cause of separation, it was held not to constitute willful desertion on the part of the wife. While the court recognizes the right of the husband to determine the abode of the family, and that it is in general the duty of the wife to submit to such determination, yet this, says the court, is not an entirely arbitrary power on the part of the husband,—he must use reason and discretion. 'Any man who has proper tenderness and affection for his wife would certainly not require her to reside near his relatives if her peace of mind were thereby seriously disturbed.' And further the court says: 'Every one at all experienced in such matters knows that it is not uncommon for the female relatives of the husband to create, either intentionally or accidentally, disquietude in the mind of the wife, and thereby destroy her comfort and health.' This is the wisdom of the Supreme Court of appellant's own State, and if he had heeded its suggestion he need not be a stranger in a strange land, seeking a divorce from a loving wife, whose only fault seems to be that she could not live in peace with his mother.

"The letter of September, in which she says to her husband that she has left Bellows Falls for the last time, was evidently regarded by appellant as a point of great importance in his case. The date of that letter is taken as the commencement of the desertion. His mother saw it, and is able to repeat its contents *verbatim* after the lapse of more than two years. When he came to Chicago to procure his divorce this letter was shown to his friends here, and one of them testifies to its

contents. After the receipt of this letter he assumes a new attitude towards his wife. His mother is more frank and outspoken in her statements to her, and they all conduct themselves as though they had got a point and were inclined to hold on to it. The approaches of the wife when she comes to Bellows Falls are coldly received. He has business away from home, and his mother 'would not let her see him if he was home.' The mother testifies that at this time there was unpleasant talk between them, — that appellant said that she (the mother) was the biggest liar in town, and that she told appellant that said appellant had deceived Charley from the beginning of their married life to the present time about owing money, etc. 'Then she talked very hard to me, and I came into the house.' Appellant having said she would not come back, was to be kept to her word. She would be allowed no *locus penitentiæ.* Her letter was the basis of a case for desertion. The home in which her husband insisted she should live was made more cold and repellent to her, and her husband, when she sought him, found occupation ten or twelve miles away, and when found by her his question is, how she found out he was there. Under such circumstances, the one who is away from the home may be truly said to be the deserted one, and the one who remains, the deserter.

"But there is another reason why the decree must be reversed. We are compelled to the conclusion that appellee is not a *bona fide* resident of this State,—that he came here away from his home in Vermont for the mere purpose of obtaining a divorce. At the end of about two years from the date of the September letter appellee came to Chicago. He came in September, 1888, and, as he says, 'went down home' early in December, and came back in August or September, 1889, and immediately filed a bill for divorce. He then remained here till early in the winter of 1889, when he went back to his father's in Vermont, and stayed till March, 1890, when he again came to Chicago and remained till July, then went

home to Vermont and spent a month and returned here, where he remained till the case was tried, in July, 1891. In the meantime his first bill was dismissed, and this bill was filed in September, 1890. The case shows that he is the only son of a farmer who has a farm of two hundred acres of land, that his parents desired him to live with them, and that he felt he could not live anywhere away from them even to make his wife happy. He has no trade, is only a farmer, and part of the time that he has been living in Chicago has worked for his board. He has been sick about two-thirds of the time while he has been in Chicago, and the best wages he has been paid when he worked was two dollars per day, and he pays six dollars a week for board. The man who employs him, and with whom he boards, is a relative. He swears now that he does not know what the desires of his parents are with reference to his return to their home. It does not appear that he ever had ill-health till then, and it is shown that he could earn at least twenty dollars per month and board. No reason is given for this change in his sense of filial duty and the indifference of his parents as to his living with them, nor as to why the sentiments of the family on that question should alter just two years from the date fixed as the commencement of the desertion. It may be that the period has some relation to the fact that in this State, which seems to have been selected by him as the forum of his divorce suit, two years' desertion is a ground for divorce, while in the State where his home is, three years is the period.

"The conviction is forced upon us, from a consideration of all these circumstances, that he is a mere sojourner here till his divorce might be obtained. The statute requiring a residence in this State should have a strict construction for the sake of the good name of the State, if nothing more, and no encouragement should be held out to such as come here, away from their homes and the domicile of the defendants, to trouble our courts with their marital infelicities. (*Hitchins* v. *Hitchins,*

41 Ill. App. 82.) This residence of this defendant is not *bona fide*, and on the merits he has made out no case.

"The decree will be reversed and the bill will be dismissed."

Mr. L. H. BISBEE, for the appellant.

Mr. H. F. WHITE, for the appellee.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

After a patient consideration of the evidence presented by the record in this case bearing upon the charge of desertion made by the bill, we are disposed to concur with the Appellate Court in the conclusion that such desertion is not proved. The evidence of the circumstances under which the defendant originally left Bellows Falls and moved to Rutland in the early part of the year 1886, leaves but little room for doubt that such removal was with the full consent and concurrence of the complainant. While the complainant and both his parents testify that her going to Rutland was contrary to the complainant's wishes and against his remonstrance, the defendant testifies that the removal was first suggested by the complainant and that it received his full approbation, and her testimony is corroborated by that of four other witnesses who testify to statements and admissions made by the complainant while he and his wife were living together in Rutland, to the effect that he was well satisfied with her removal to that place, giving as a reason, that his mother made it uncomfortable for his wife at Bellows Falls, and that he and his wife could live together more comfortably in Rutland than there. The defendant is further corroborated by the facts, which are not disputed, that the complainant assisted her in making such removal, and actually packed and shipped her goods to Rutland after she had gone there, and soon after followed her to that place and lived with her, making his home with her at her parents', for about two months.

The specific charge of desertion made by the bill, however, is based upon the circumstances of the defendant's return to Rutland in the early part of September, 1886. It appears that the complainant, after remaining with his wife at Rutland until the latter part of June, and the employment which he had obtained there failing, concluded to go home to his father's to help him in his haying. It was at the same time agreed that the defendant, as soon as the busy season of her millinery business was over, which would be about the fourth day of July, should follow him and that she should spend her vacation at Bellows Falls. In pursuance of this arrangement, she returned to Bellows Falls on the third day of July, and remained there, living with the complainant at the house of his parents for about five weeks, when she went back to Rutland. Shortly afterward, the complainant sent word to the defendant that he would come to Rutland and take her to Saratoga for a short visit, if she would consent to return to Bellows Falls with him. To this she agreed, and after a short trip to Saratoga, both returned to Bellows Falls. She remained there at that time until September 2, and then went back to Rutland. It is probably true that her going to Rutland at this time was not in accordance with the complainant's wishes, although he accompanied her to the depot and saw her off on the train. Two weeks later she wrote him a letter, which seems to have been lost, but the contents of which are testified to by witnesses, in which she declared that she had visited Bellows Falls for the last time, and that he would never see her again at that place. Her going to Rutland at that time may be accounted for, and perhaps justified, by the fact that she was engaged, as partner with her sister, in the millinery business at that place, a business which, presumably, required her presence there, and in which she had embarked; as the evidence clearly shows, with her husband's consent and approval. Her letter in which she announced her determination never to show herself again in

36—141 ILL.

Bellows Falls may perhaps be accounted for on the theory that she was still beset by unpleasant recollections of what she regarded as unkind and unfriendly treatment at the hands of her husband's mother. That, under all the circumstances, it is to be given the force of a declaration of a fixed intention to abandon her husband, may well be doubted. What she meant by it may be better interpreted in the light of her subsequent conduct, than by the strict force and meaning of the words employed.

But even if it should be conceded that she left the complainant September 2, 1886, with a fixed determination to desert him—a conclusion which in our opinion the evidence fails to establish—such act of desertion, of itself, comes far short of what is requisite to entitle the deserted party to a divorce. Our statute authorized a decree of divorce when either party "has willfully deserted or absented himself or herself from the husband or wife, without reasonable cause, for the space of two years." However willful the desertion may be, and however destitute of reasonable cause, it is no ground for divorce, unless it is continued for two years. At any time during that period, the offending party has an undoubted right to put an end to it, and if that is done, no cause of divorce has arisen. If at any time during the two years, the party guilty of the desertion, in good faith and with an honest intention to resume marital relations, returns or offers to return to the deserted husband or wife, the continuity of the desertion is broken. Nor can the deserted party prevent this by refusing to receive back and to resume marital relations with the one guilty of desertion. He or she can not, because the other has taken a position, however willful or causeless it may have been, hold him or her to it. For the two years the door for repentance and return must be kept open, and if it is closed and barred when an offer to return is made in good faith, not only is the desertion terminated, but the circumstances may be such as to reverse the legal

attitude of the parties, and constitute the party originally offended against, from that time forth, the offender.

The evidence shows, and upon this branch of the case there is but little apparent conflict, that for several months after the time of the alleged desertion, the defendant made repeated and persistent efforts to return to her husband, but without success, her husband sometimes shunning her, at other times ignoring her presence, and wholly failing, if not directly refusing, to receive her back or to allow her to live with him as his wife. In no view of the case can it be held that the desertion charged was continued for the period of two years.

But we are unable to concur with the Appellate Court in its conclusion that the evidence fails to show that the complainant was a resident of this State for one year next prior to the filing of the present bill. While there are various circumstances surrounding the case tending to awaken a strong suspicion that his residence here was merely colorable; that his only purpose in coming to this State was to apply to one of our courts for a divorce, and that he came with no bona fide intention of establishing a residence in this State, still we are of the opinion that the effect of the evidence in the record is, to prove, at least prima facie, that for one year prior to the filing of the present bill, his legal residence was in Illinois. He came to this State a little more than two years before said bill was filed, as he swears, with the intention of becoming a resident, and that such has been his intention ever since. It is true that during that time, and particularly during the first year of his alleged residence here, he was absent a considerable portion of the time, on visits to his former home in Vermont, but he swears, and in this he does not seem to be contradicted by any other witness, that such visits were all for temporary purposes, and that his residence during all the time was in this State. The place of one's legal residence is very largely a matter of intention, and the positive testimony of the complainant as to the intention

with which he came to this State and has resided here, is not overcome by circumstances which give rise to mere suspicions that his testimony in this respect is false, but present no tangible facts upon which that conclusion can rest. If his residence here were merely colorable, it would be insufficient to give the courts of this State jurisdiction to entertain his bill for a divorce. But as the evidence is sufficient, prima facie, to prove a bona fide residence in this State for the prescribed period prior to the filing of his bill, we are of the opinion that the order of the Appellate Court that the bill be dismissed can not be sustained on the ground of want of jurisdiction in the Superior Court. But on the other ground, viz., the failure of the complainant to prove the desertion charged the bill was properly ordered dismissed, and on that ground the judgment of the Appellate Court will be affirmed.

The appellee, prior to the submission of the cause on final argument, entered her motion to tax against the appellant the cost of an additional abstract of the record which her counsel has deemed it necessary to file in order to a proper presentation of the case in her behalf, and the decision of said motion was reserved until the final consideration of the case. We have examined the appellant's abstract filed here, and are of the opinion that it fails to properly or adequately set forth the substance of the appellee's evidence, and that an additional abstract on the part of the appellee was therefore proper and necessary. But the abstract filed by the appellee in this court is merely the abstract which she had printed and filed in the Appellate Court, she being the appellant there, and as she has already recovered in that court her costs, which included the expense of printing said abstract, there would be no justice in taxing the cost of said abstract against the opposite party a second time. Her motion in that behalf is therefore denied.

*Judgment affirmed.*