Decided 2 July, 1900.

# OGILVIE *v.* OGILVIE.

[61 Pac. 627.]

DIVORCE FOR DESERTION—MEANING OF WILLFUL.

1. The word willful, as used in Hill's Ann. Laws, § 495, subd. 5, authorizing a divorce for "willful desertion," means an intentional forsaking, wrongfully and without cause, whereby the marital union is destroyed.

DIVORCE—EVIDENCE OF "WILLFUL DESERTION."

2. A husband went on a trip to be absent several months, leaving ample provision for his family. A short time before he returned his wife left his home, and went to her relatives, in a distant city, without disclosing her intention to any of the members of her husband's family, or leaving any message for him. Her husband did not hear anything from her until about three months after her departure, when he met her, and she told him that she left because she had feared bloodshed on account of a man whose attentions to her he had objected to. *Held*, that the conduct of the wife amounted to a "willful desertion," and that the husband was entitled to a divorce on that ground, after the expiration of a year from her departure.

DIVORCE—DUTY AS TO RECONCILIATION.

3. In cases of desertion the offending party may always return and offer a reconciliation, and if the injured spouse rejects such offer without other cause for continuing the separation, such spouse not only thereby consents to the existing condition, but assumes the position of an offender from that time. The injured party, however, need not make the first advance, but may safely rest on the situation already brought about.

INQUIRY AS TO WHAT MIGHT HAVE BEEN.

4. Disputes must be settled with reference to the existing facts, and not by conjecture or speculation as to what one of the parties would have done under a hypothetical state of facts; thus, where a wife has deserted her husband, he cannot be prejudiced by an inquiry whether he could or would have lived with her had she sought a reconciliation.

DESERTION—EVIDENCE OF OFFER TO RETURN.

5. The evidence does not satisfy the court that the wife ever made any genuine offer or attempt to return to her husband or to be reconciled after her desertion of him.

SEPARATION AGREEMENT—INFERENCE OF CONSENT TO DIVORCE.

6. A contract between husband and wife concerning their property interests, made after one of them has been so at fault as to warrant a divorce, is not a consent by either to a divorce, nor does it justify an inference that the cause of divorce was brought about by mutual consent: *Henderson* v. *Henderson*, 37 Or. 141, approved.

From Gilliam :   W. L. BRADSHAW, Judge.

This is a suit for divorce by Alex. G. Ogilvie against Rose Ogilvie upon the ground of willful desertion for the period of one year.   For a defense, the wife denies the desertion, and alleges that she left the plaintiff's home temporarily, at a time when he was absent in England, without any intention of deserting him, and that she returned, and proffered to resume her marital duties, but that he refused to allow her to do so.

The parties were married in 1885, and three children were born to them, to wit, Robert Gordon, Patrick Alexander, and Charles Freeland, aged, respectively, thirteen, nine and seven years.   They lived together happily until about June, 1897, at which time the defendant admitted to plaintiff that she had permitted one Fred Earl, some time in the fall or December preceding, to put his arms about her.   For this offense the husband chided her, or, as he says, told her that he "didn't think such conduct was right as a mother and wife," and, as she says, threatened that if he (Earl) ever stepped his foot on the ranch he would kill him and kick her out, and, upon meeting Earl, he directed him not to come about his ranch any more.   This incident appears to have been amicably reconciled at the time, which is shown by the wife's testimony.   She was asked, "He had made your home very unpleasant for you during that summer, had he?" to which she answered : "Yes, sir; that is, remembering the threat.   Of course, he tried to make it cheerful enough afterwards."   And, again, "He seemed to

have forgotten the threat?" to which she replied, "It appears so." Plaintiff was a sheep raiser by occupation, and lived upon a ranch some six or eight miles from the town of Fossil, but in September, 1897, preparatory to going on a visit to England, and for the purpose of making his family more comfortable during his absence, he purchased a dwelling in Fossil, and moved there with his family, including his mother, who had been living with the family for several years. He started to England the latter part of September, leaving ample provision for the comfort of his family until his return, and was absent until late in February, 1898. While away, he wrote to his wife frequently, and advised her as to the time of his return, telling her that he had presents for her and the children, sent by his relatives. On the twenty-eight of January, 1898, without indicating her purpose to his mother, she left her home and went to Albany to her relatives. The plaintiff returned in her absence, and was informed by neighbors that she had left home indefinitely, and had been advised by friends to sue for a divorce. This was the first intimation he had of her absence. He says that the first intelligence he had of her whereabouts was obtained the latter part of May, through a letter from her uncle requesting the return of money he let her have, which he paid, as desired. Touching the money matter there is some dispute, as defendant testifies that it was paid at her request after she went back to Fossil. She returned to Fossil on the seventh day of May, 1898, and went directly to a hotel; but, owing to plaintiff being on his ranch, he did not meet her until about June 5 following. She testifies that upon the morning of her arrival she went to their residence at Fossil, and, finding no one at home, she went in, prepared and ate her breakfast; that she re-

turned again at noon, and finding no one there, and the door locked, she returned to the hotel.

Concerning these circumstances, the plaintiff asserts that he had no knowledge until informed by her. When the parties met the plaintiff was talking to some men, and as she came up they recognized each other, and shook hands. She asked him to go aside for an interview, but he arranged a meeting with her at the residence, where she gave as her excuse for leaving him that it was to prevent bloodshed, which was afterwards explained to mean that she was afraid Earl would be hanging around, and that it would end in bloodshed. He states that she expressed a desire to have what was coming to her, and, when asked what she thought it was, replied that she would leave it to him ; whereupon he told her that when they were married she had in the neighborhood of $800 or $900, to which she assented. He then told her that he would give her $3,650, to which she was perfectly agreeable, and thereupon they arranged to go down to Mr. Hendricks' office the next morning and have the papers prepared. On cross-examination, he said his chief desire was to place her above want, and that the amount agreed upon at ten per cent. would give her an income of a dollar a day. He made no suggestion to her that she could remain at the house or live with him again. As touching his desire for a reconciliation, the following testimony was elicited : "Q. Well, do you mean to say that under the circumstances you could not live with her ? A. I should say I could not, knowing what I knew. Q. Then, of course, you made no suggestion to her that she could remain at your house or live with you ? A. I made no suggestion to that affect. Q. And if she had suggested that she desired to live with you, under the circumstances, you could not have permitted her to do so ? A. I cannot be answerable for my feelings with regard to that matter.

Q. What would you have said to her if she had asked to return to you at that time ?   A. I cannot say, under the circumstances, what I would have said.   Q. But you can say that under the circumstances you could not have lived with her ?   A. Of course, my feelings were naturally outraged at her conduct.   Q. And, feeling in that way, you could not have lived with her ?   A. I cannot say.   If she had shown a due disposition, probably it might have been patched up.   *   *   *   I can't say but what, if she had shown a due disposition and a sincere regret of what had taken place, what would have happened.''   She testifies that she first told him at this interview ''she had come home to take up her family duties,'' and he replied ''that he was done with women,'' and then it was she told him, at his urgent solicitation, that she would not ask for more property than she had when they were married.   The plaintiff denies emphatically that she ever offered to return to him or to take up her family duties.   His language is :   ''The facts of this conversation were that she made no request whatever of me in any form to return to me or be taken back as my wife.''

She testifies that when she went back to Fossil she wrote two letters to her husband in her effort to see him, and that she kept copies of the letters.   These copies were introduced in evidence, and marked Exhibits ''A'' and '' B,'' over the objections of the plaintiff, without an effort to obtain the originals or to show their loss.   It does not appear that the originals were posted, or in what manner, if at all, they were forwarded.   The copies are in the following language :

EXHIBIT A.

''*My Dear Husband:*
I thought I would drop you a few lines to let you know where I am.   I am at Mrs. Spears' hotel.   Come up Sunday.   I want to see you.   I have your ring, and I wear

it, and when I take it off my finger you will know I am not true to you. You have mine. So believe me your ever loving wife,                ROSINA J. OGILVIE.''

''*My Dear Husband:*

I thought I would write to you, and let you know where I got my money to go away on. I sold my black dress for seven dollars. That took me to Portland. I stayed with Mrs. Robberson a week. Then I got ten dollars from Cyrus Buffington. Then I went to Albany. There I remained with my father's folks till I was ready to come home. Then I borrowed twelve dollars from Uncle Davie Froman, and I want you to let me have the money to send him, for I shall not see H. H. Hendricks about anything ; so I want the money to send right away. So believe me your wife,                R. J. OGILVIE.''

The plaintiff in his rebuttal does not deny having received these letters, nor was his attention called to them. On the day defendant returned to Fossil, Harry Reed, who was then living in the plaintiff's house with his family, took plaintiff's mother and his children out to the mother's homestead, some four or five miles from town, and there is evidence in the record that she hurried the children away after hearing of defendant's return ; but it appears that the latter went out to the homstead, visited the children, had dinner with her mother-in-law, and passed the time pleasantly.

On the day following the interview of the parties at the house they entered into the following agreement, which was drawn up by the attorney for the plaintiff:

'' This agreement, made this thirteenth day of June, 1898, at Fossil, in Gilliam County, Oregon, by and between Alex. G. Ogilvie, party of the first part, and Rose Ogilvie, party of the second part, witnesseth that

*Whereas* the said Rose Ogilvie, having had in property at her marriage with Alex. G. Ogilvie of the value of $900,

which her husband, Alex. G. Ogilvie, has had the use of
in his business, and the said Rose Ogilvie having deserted
the said Alex. G. Ogilvie, and now asks for a division and
final settlement of all property affairs and interests be-
tween them,

*It is hereby agreed* that the said Alex. G. Ogilvie shall, in
consideration of the $900 aforesaid, and in the further con-
sideration of the said Rose Ogilvie relinquishing all her
right in all the real and personal property of the said
Alex. G. Ogilvie, which he now has or may hereafter ac-
quire, forever, which the said Rose Ogilvie hereby agrees
to do, pay unto the said Rose Ogilvie the sum of $3,650
on or before five years from date, with interest at ten per
cent. per annum, payable quarterly, and that he will give
his note as evidence thereof, and give satisfactory security
therefor. It is also agreed that Alex. G. Ogilvie shall edu-
cate and support the children, issue of their marriage, to
wit, Robert, Patrick, and Charlie Ogilvie, and have the
care and custody thereof, but that he will not refuse the
said Rose Ogilvie at any time to visit them."

Mr. Hendricks testifies touching this paper that when
the parties came to his office he inquired into the matter
of their agreement; that the plaintiff said, among other
things, "My wife has left my home indefinitely," to which
she freely assented, but remarked that she believed that
they might some time live together, but it wasn't proper
for them to try to do so now.

It appears further from the testimony that in the De-
cember prior to her departure she met Earl at the home
of her sister, some seven or eight miles from Fossil, and
she was heard to say to him, "well, Fred, I am going
away, whether you do or not." She freely admits this
interview. It further appears that she wrote a letter to
Earl, and sent it to him inclosed in another letter directed
to a friend. This letter was read to him by another per-
son, who testifies to its contents, which were, in effect,

that she wanted him to meet her at the back porch of their residence in Fossil, at 8 o'clock of the evening designated; but she testifies that he did not meet her at the time, and states that her reason for wanting to meet Earl was to request him to go away so that no harm could come to him from her husband. The plaintiff and defendant next met in the latter part of January following at the Perkins Hotel, in Portland, Oregon, which was the only other meeting they had within a year from the time of her leaving him. At this time the defendant signified to plaintiff her desire to have an interview with him. He excused himself by saying he did not have his breakfast, but agreed to return to the hotel and see her later, which he failed to do. They had other conversations on the ninth and tenth of July, 1899, but these are not material to this controversy, and will not be further alluded to. The trial court rendered a decree of divorce in favor of the husband, from which defendant appeals.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. W. H. Wilson.*

For respondent there was a brief over the name of *Hendricks & Bowerman,* with an oral argument by *Mr. H. H. Hendricks.*

MR. CHIEF JUSTICE WOLVERTON, after stating the facts in the foregoing language, delivered the opinion.

This is a brief resume of the evidence in the case, without attempting to quote the witnesses at large, and upon this testimony it is insisted (1) that it has not been shown that the defendant willfully deserted plaintiff; and (2) that it has been shown that the plaintiff assented to her

living separate and apart from him, and therefore that desertion contrary to his will and without his consent has not been established.

1. "Desertion" has been defined by Mr. Bishop in his work on Marriage, Divorce and Separation (vol. 1, § 1662), to be the "voluntary separation of one of the married parties from the other, or the voluntary refusal to renew a suspended cohabitation, without justification either in the consent or wrongful conduct of the other." This language is quoted with approval in *Sisemore* v. *Sisemore*, 17 Or. 542 (21 Pac. 820). Perhaps a more terse definition is that given in 9 Am. & Eng. Enc. Law (2 ed.), 764. The author says : "Desertion is the willful termination of the marriage relation by one of the married parties without lawful or reasonable cause, or a refusal without reasonable cause to renew the marriage relation after the parties have been separated." An intentional desertion is willful, within the meaning of the term as defined by the statute. The term does not carry with it the element of malice or a purpose of doing injury. The act is willful when there is a design to forsake the other spouse wrongfully or without cause, and thereby break up the marital union : *Benkert* v. *Benkert*, 32 Cal. 467. Before the plaintiff can prevail, he must therefore show that the defendant willfully—that is, intentionally and wrongfully, or without cause—deserted him, and continued in such desertion for the space of one year.

2. Aside from what defendant said to Earl, there is nothing in the record to show her intention except the circumstances attending the act. She left home without leaving any message for her husband, of whose early return from England she had been advised, or without disclosing her purpose to her mother-in-law, with whom she left her children. She remained away some three or four months, without writing to any of the family except her

son.    There appears to have been no legitimate cause or
sufficient excuse for her going.    The only one assigned
by her is that she was afraid there might be bloodshed ;
but, if there was ever any real danger of such a thing, it
was wholly within her power to have prevented it by a
considerate loyalty to her husband.    The intention to
desert may be shown by the acts and circumstances at-
tending the separation :    *Morrison* v. *Morrison,* 20 Cal.
431 ;   1 Nelson, Div. & Sep. § 107.    In the present in-
stance, such intention is palpably manifest.    The burden
is also with the plaintiff to show that the desertion was
wrongful or without just cause, and there is no question
but that this has been shown, as it relates to the separa-
tion primarily.

3.    This brings us to the second feature of the case,
which, under the facts proven, is more difficult of solu-
tion.    It may be predicated of the statute that the deser-
tion must continue for the period of one year,—that is
to say, the act is continuing in its nature,—and, if sus-
pended in the meanwhile by reconciliation or by the
repentance of the party at fault, with a proper and sin-
cere effort towards reconciliation, manifesting a purpose
to return and again resume the marital relations, then
the desertion is at an end.    If the parties separated by
mutual consent and understanding, then there is no de-
sertion, because of the consent to the existing relations.
So, if there is willful desertion without cause, and the
party in fault in good faith seeks a reconciliation, and
the other party repels it without other cause for continu-
ing the separation, he thereby assents to the prevailing
condition.    What is more, he is himself put in the fault,
and is guilty of desertion, such as will constitute a cause
for divorce against him :    *Crow* v. *Crow,* 23 Ala. 583.
The rule is well stated and illustrated by Mr. Justice
BAILEY, in *Albee* v. *Albee,* 141 Ill. 550 (31 N. E. 153),

under a statute making two years' desertion a cause of divorce. The case is so apt that we may be pardoned if we quote somewhat at length: "However willful the desertion may be, and however destitute of reasonable cause, it is no ground for divorce, unless it is continued for two years. At any time during that period the offending party has an undoubted right to put an end to it, and if that is done no cause of divorce has arisen. If at any time during the two years the party guilty of the desertion, in good faith and with an honest intention to resume marital relations, returns, or offers to return, to the deserted husband or wife, the continuity of the desertion is broken. Nor can the deserted party prevent this by refusing to receive back and to resume marital relations with the one guilty of desertion. He or she cannot, because the other has taken a position, however willful or causeless it may have been, hold him or her to it. For the two years the door for repentance and return must be kept open, and, if it is closed and barred when an offer to return is made in good faith, not only is the desertion terminated, but the circumstances may be such as to reverse the legal attitude of the parties, and constitute the party originally offended against, from that time forth, the offender." Nor has the husband, as declared by Mr. Vice-Chancellor VAN FLEET, in *Newing* v. *Newing*, 45 N. J. Eq. 498 (18 Atl. 166), a "right to require his wife, even when she is in the wrong, to crawl back to him. It is his duty to take her back upon such terms as will permit her to preserve her self-respect." The husband, however, is not called upon, where the wife has willfully deserted him, to make overtures to her, or to entreat her to return, upon pain of having his silence construed as a consent to her separation from him.

4. Closely allied to this thought is another, which is that the relationship could not be changed by an inquiry

as to what he might have done if his wife had made proper overtures for reconciliation. Such an inquiry is speculative and conjectural, and is not a suitable test of the husband's purpose. "No person knows what he would have done under conditions in which he was never placed :" *Monteath* v. *Monteath*, 51 Ill. App. 126. Mr. Justice HOLMES has covered both phases of the question in *Ford* v. *Ford*, 143 Mass. 577 (10 N. E. 474), wherein he says : "When one party terminates the cohabitation by desertion, the other is not bound to take any steps to restore it. If he remains silent until he files his libel, his silence does not take away his right to a decree. Conduct which in itself is proper cannot be made improper by inquiring what he would have done in an event which did not happen. The mode of testing that was for the wife to offer to return. A tender under a contract would not be excused by the contractee's subsequent admission that he would not have accepted it if made, provided he had done no overt act or waiver. In general, a person does not lose rights which he may lawfully renounce until he has renounced them by an overt act." There are authorities which seem to impose a larger duty upon the husband, and require him to seek the wife, and entreat or make some especial effort to induce her to return. See *Newing* v. *Newing*, 45 N. J. Eq. 498 (18 Atl. 166); *Herold* v. *Herold*, 47 N. J. Eq. 210 (20 Atl. 375, 9 L. R. A. 696); *Wright* v. *Wright*, 80 Mich. 572 (45 N. W. 365). But it is doubtful whether these authorities go to the extent of holding that such advances should be made where the husband is entirely blameless for his wife's acts. The whole doctrine seems to be well stated in *Herold* v. *Herold*, 47 N. J. Eq. 210 (9 L. R. A. 696, 20 Atl. 375), as follows : "It is abundantly established that a husband who, not being blameless for the act, makes no effort to prevent his desertion by his wife,

and appears to acquiesce in and be satisfied with its continuation, cannot appeal successfully to the court for a divorce on the ground of desertion." Again, it is a question for the court to determine, under the circumstances of the case, whether the offer to return and renew the cohabitation is made in sincerity, and with a *bona fide* intention to renew the marital duty : *McClurg's Appeal*, 66 Pa. St. 366.

5. With this understanding of the law, we must now inquire whether the defendant has, in fact and in good faith, made overtures to the plaintiff, with a genuine purpose of reconciliation, and, if so, whether the plaintiff has, without good cause, rejected them, so as to put him in the fault, or in the position of having consented to her separation from him. The letters of Mrs. Ogilvie, written to her husband at Fossil, purported copies of which were received in evidence by the court below, are relied upon somewhat as showing her desire to return. It may be well doubted whether these are properly in evidence for any purpose ; but, even if we admit them as evidence in the case, they do not prove what is contended for them. In the first she says : "I thought I would drop you a few lines to let you know where I am. I am at Mrs. Spears' hotel. Come up Sunday. I want to see you. I have your ring, and I wear it, and when I take it off my finger you will know I am not true to you." There is here no indication that she desired to again renew the marital relations between them, nor does she intimate that the purpose of the desired interview was to effect a reconciliation in any manner with her husband. That she still wore the ring as a sign that she was true to him could not be construed that she desired a reconciliation. The second letter was entirely concerning money matters, and does not even request an interview. She testifies that she told him at the interview at the house that she had come back

to take up her family duties again ; but the offer does not impress one as having been made with a sincere purpose, if, in fact, she made it at all, which is doubtful, in the face of his strong denial, accompanied by circumstances tending to his corroboration.   It does not appear to have been attended with any attempted explanation of her acts, and, standing alone, is a meaningless formality.   Upon the next day, by the terms of the written agreement, she formally declared that she had deserted her husband. This she could hardly have been induced to do if she had a genuine yearning for the restoration of the marital relations with him.   She may not have been settled in her own mind as to what she might do in the future, as she said to Mr. Hendricks that she believed they might live together some time, but she had determined that it "wasn't proper for them to try to do so now."   The manner of her attempted interview with her husband at Portland does not indicate any desire upon her part to return to him, as she merely asked for an interview, without disclosing any purpose whatever, and for aught that appears she may have had in view something entirely foreign to a reconciliation of their differences.   In view of all the evidence, and in the light of surrounding circumstances, we can come to no other conclusion than that defendant is still in the fault, that plaintiff has in nowise assented to her desertion of him, and is therefore entitled to a divorce.

6.   Another question was presented in connection with the written agreement between the parties, which is that the writing shows an assent by the husband to the separation.   This agreement was made, however, after it had actually taken place by the desertion of the wife ; and it was held in *Henderson* v. *Henderson,* 37 Or. 141 (38 L. R. A. 766, 60 Pac. 597), that where a separation has been induced, not by collusion, but by the vicious conduct of one of the parties, without inducement or fault of the

other, and it has furnished just grounds for divorce, then a contract looking to a settlement of the property rights and the proper maintenance of the one not in fault could properly be entered into, as not repugnant to public policy. Such an agreement does not justify an inference that there was a separation by mutual consent: *Nichols* v. *Nichols* (Ky.), 11 S. W. 286. The decree of the court below will be affirmed.                                    AFFIRMED.

Decided 18 June, 1900.