MARK J. SEEDS v. MABEL CONKLING SEEDS, Appellant.

**Divorce:** DESERTION : EVIDENCE.   Where the gist of the defense to an action for divorce by the husband on the ground of desertion is that defendant left her husband when in a state of mental derangement, but upon her recovery soon after she was ready and willing to resume her family relations with him but was refused the right, evidence that she left because of plaintiff's cruel treatment, which is without sufficient corroboration, should not be considered in determining the real issue.

**Same:** EVIDENCE REVIEWED.   Evidence in support of a petition. for divorce on the ground of desertion is reviewed at length and held to justify a decree granting separation.

**Same:** DESERTION : OFFER TO RETURN.   The party at fault in the original separation who desires to resume the marital relations within the two years, to prevent the desertion from becoming a ground for divorce, must make a good faith offer to return without conditions other than those incident to the proper treatment of each by the other as husband and wife; the party not at fault need not solicit a return, it is sufficient if an unconditional offer to return has not been refused.

*Appeal from Des Moines District Court.*—HON. W. S. WITHDROW, Judge.

TUESDAY, OCTOBER 27, 1908.

ACTION for divorce on the ground of desertion.   Decree for the plaintiff, from which defendant appeals.— *Affirmed.*

*Mercer & Mercer,* for appellant.

*F. E. Thompson* and *A. M. Antrobus,* for appellee.

McCLAIN, J.—It is conceded for defendant that in April, 1903, after she had been married to plaintiff for about six years, and had become the mother of two children, she left the family home without her husband's knowledge, and for a period of two years before this action was brought, and ever since, has lived separate from him. The questions submitted to us relate to defendant's mental condition at the time of leaving her home, and the subsequent attitude of plaintiff and defendant toward each other with reference to her return.

I. It is alleged for defendant that plaintiff mistreated, humiliated, and harassed her almost from the time of their marriage, and behaved toward her in a coarse, cruel, and brutal manner, making unreasonable sexual demands upon her. Defendant's testimony as a witness strongly supports these allegations. It must be said, also, that her testimony is to some extent corroborated by that of a maidservant, who was employed in plaintiff's home from a date about a week prior to the separation until more than a month after that time. This testimony, however, is not relied on by defendant's counsel as in itself requiring any different result than that reached by the trial court; and it is evident that the truthfulness of this testimony is not controlling, for it is insisted, in defendant's behalf, that she did not voluntarily leave her husband, and that, since regaining mental capacity soon after she in fact left home, she has been willing and anxious to return and resume her relations to him and their children of wife and mother. Voluntary abandonment by her of her home on account of mistreatment, and disinclination to return until there should be some assurance that the conduct of her husband towards her should be different from and more considerate than that

1. DIVORCE: desertion: evidence.

which she had received before leaving, are entirely inconsistent with the position taken by her counsel that she was out of her head when she left home, and had no conscious intention of leaving, and that from the time she recovered· consciousness she had been anxious to return without conditions and live as plaintiff's wife. In her testimony she persistently states that she does not know why she left her home, that she had no intention of leaving it, and that her act in doing so was without consciousness of what she was doing, and she also insists, in the face of some testimony for the plaintiff to the contrary, that she has at all times since recovering consciousness been anxious to return, and has only been prevented from doing so ·by the refusal of the plaintiff to receive her. While defendant's testimony, if believed with regard to her husband's conduct towards her prior to the separation, would no doubt have justified a decree for divorce from him on the ground of cruel and inhuman treatment, it is but slightly corroborated, save in the fact that defendant was at times physically· weak and in poor health, while there is other evidence in the record indicating that she was not strong physically when she was married. The inference which counsel for defendant would have us draw from defendant's testimony with reference to her husband's ill-treatment is that it was such as to render defendant weak, nervous, and for the time being practically insane, so that she wandered away from her home without any consciousness as to what she was doing; but the physicians who testified in behalf of the defendant did not corroborate this theory and we feel justified in dismissing from consideration, as the cause of defendant's leaving her home, the previous conduct of her husband towards her, however reprehensible it may have been, as having no bearing on the issues which we are now called upon to determine.

II.   The material facts as to the abandonment of

her home by defendant are that on the evening or during the night of April 17, 1903, after her husband had re-tired in another part of the house, defend-ant, having made some slight preparation, left her bedroom and the home, and walked to the town of Mediapolis, a mile or more distant, where she took a train going north toward Cedar Rapids, and that early in the morning of the 18th she passed through Mediapolis, going south toward Burlington; that her husband learned of her being on the train going south, and by telephone requested a friend of his to meet defendant at Burlington, and take care of her, which was done, and defendant being found to be in a weak condition, she was taken to a hospital in Burlington, where she remained for nine or ten days. Plaintiff, and two doctors secured by him, saw defendant in this hospital on the afternoon of the 18th, and she was visited by him and friends of his several times while she remained there. During the first four or five days after arriving at the hospital, there were indications that defendant was men-tally unbalanced, and she testified that she had no recol-lection of the circumstances of her leaving home or being taken to the hospital, and only became conscious of her surroundings after some days had elapsed. Steps were taken by plaintiff, or with his approval, to have defendant removed to the hospital for the insane, but when an exam-ination was made as to her mental condition, she was found to be then in her right mind, and further pro-ceedings in that direction were abandoned. At plaintiff's suggestion, or at any rate with his full consent, defendant went from the hospital to the home of her parents, not far distant from Mediapolis, and she has remained with her parents ever since that time.

2. SAME: evi-dence re-viewed.

In determining whether the separation of defendant from her husband for two years and more has constituted such desertion as by the statute is made a ground for

divorce, the mental condition of defendant at the time she left her husband's home is not conclusive one way or the other. If she was irresponsible at the time, but after recovering consciousness persisted, without cause, in refusing to return, then the desertion is made out, while on the other hand, even though she consciously and deliberately left his home, if she subsequently repented, and was prevented from returning only by his refusal, without cause, to receive her, then the statutory desertion for two years is not established. It is necessary, therefore, to take into account the conduct and relations of plaintiff and defendant towards each other from the time defendant left her husband until the expiration of the statutory period, and all attendant facts and circumstances in ascertaining where the fault lies for this continuing separation.

At the time of the marriage defendant was a member of the Baptist Church, and after she and her husband came to reside near Mediapolis, she was, active in the work of the church at that place. Having received a good musical education, and being an accomplished singer, she was a member of the choir, and for some time during the latter part of the year 1902 she was, with her husband's consent, absent from home and in another State, assisting as a singer in conducting a series of revival meetings. The pastor of the Baptist Church at Mediapolis was a young minister, Williams by name, who had come from Cedar Rapids, where he had been educated, and in whom defendant, by her own confessions, became very much interested. In February and March of 1903 this minister conducted a series of revival meetings in Mediapolis, which defendant frequently attended, driving alone from her home to town for that purpose, and on various occasions the minister rode back with her after the conclusion of the services, leaving her, however, a short distance before she reached home, and walking back to town. Defendant testifies to an affection on her part

for the minister at this time, which was not proper in a married woman, and admits that on two or three occasions he kissed her without resistance on her part, and she admits that she did not advise her husband as to these relations. Indeed, so far as appears, her husband had no knowledge of her conduct in this respect until after she had left her home and gone to the hospital at Burlington.

With this prelude the drama of domestic infelicity moved forward with the usual incidents to its denouement in a divorce court, the chief actors being the husband, the wife, and the minister, and the motif, not plaintiff's ill-treatment of the defendant, save as it may have predisposed her to undue affection for another man, but defendant's infatuation with the minister and consequent wrong to her husband, and the resulting conflict in her mind between her love for the minister and her duty to her husband and children. Defendant had, at one time during her acquaintance with the minister, gone to Cedar Rapids and seen him there. At another time, when in Chicago with her husband, and remaining longer than he, she had met the minister, whether by previous arrangement or not we are unable from the testimony to say, and had gone with him to the theater. This, in itself, was under the circumstances not an incident casting any discredit on defendant or the minister, unless it was by preconcerted arrangement, without her husband's knowledge, for her husband had proposed that she return home on a later train, and advised her to go to some place of amusement during the evening and enjoy herself. There is no indication that the husband had any suspicion that his wife had an improper feeling for the minister, or would have objected to her action if their meeting was, as she claims, accidental. The minister had, prior to defendant's separation from her husband in April, severed his connection with the Mediapolis

church, and returned to Cedar Rapids; and upon defendants' leaving her home, there was talk of scandal, not only among the acquaintances of defendant and her husband at Mediapolis, but also among friends of the minister, two or three of whom solicited plaintiff to take back his wife and hush up the scandal, which was so injurious to the minister's reputation. All these circumstances throw light on the conflicting accounts given by plaintiff and defendant, and various other witnesses, as to what was said between the parties at various interviews had between them at the hospital in Burlington, where plaintiff and two or three of his friends, one of them the family physician, who had treated defendant during her illness prior to the separation, had interviews with defendant. Plaintiff testifies that he urged his wife to return and face with him the scandalous reports which had been circulated about her, and other witnesses in his behalf testify to urging such return. On the other hand, defendant testifies that while her husband did discuss with her the subject of returning, he made it appear that it would be very unpleasant for her to come back to his home, and urged her to go to her parents. A letter written by defendant to plaintiff from the hospital at Burlington, throws light on these interviews:

My thoughts have been a little clearer today, and I will try and tell you. I think I must have told you that I would go back with you, but I have been counting the cost since then, and I don't think you would ever be satisfied. It may seem easy to you now to talk of taking me back, and I do really honor you for that, but in a little while the novelty of your devotion would wear off, and I would be only a poor make-believe wife, when all *all all* my love is centered on some one else, and especially when I feel so sure of his love. I know about his engagement while he was away last summer. A Mediap. girl tried for a joke to make people believe they were engaged, and when people believed her, she kept the joke

up until he came back, when he denied it. Then I suggested to him that he should announce that he was engaged, but not to this Med. girl. So he did, and told me to tell it, too, and any one that he has told will give you a description of his sweetheart that describes me, for it was myself. Now what he told Jake is perfectly true, for we are virtually engaged, but I am sure Jake misunderstood him when he thought he said to 'another woman,' and even if he said that, he told it with an idea of protecting me from something that concerns only himself, but no woman, so I will never believe it, unless he tells me with his own lips, and I am going to write and ask him. I am glad you love me, Mark, for now you can realize how I love him. I am getting along nicely. Kiss the babies for the sake of the mother they ought to have had instead of me. Will look for you Sunday. In sorrow, Mabel.

While still at the hospital, and probably after the writing of the letter just set out, defendant in her husband's presence, and with his knowledge, wrote the following letter to Williams, and gave it to her husband to mail, although he, in fact, did not mail it, but retained it in his possession without her knowledge:

Dear, I received your letter this a. am., and soon after Mark came with your letter to him. He has been very gentle and kind to me, and has certainly proved his love for me, not only by his kindness to me, but by his generosity toward us both, and it was he who proposed writing to you again. I can understand your letter perfectly, dear, and it shows me, more than ever before, how much you love me to be able to make such sacrifices for me. Mark has wanted me to go back with him until today he was convinced that I could never content myself there again. So he proposed the plan of getting a divorce from me on the grounds of desertion, after which you and I would be perfectly free to take whatever action we chose. He offers this simply as a chance for my happiness, and I thought it best to write you of the plan. We have talked together very freely, although there is still much that I can not clearly recall, but he knows

enough of our relation together to be convinced that our regard for each other is more than cousinly, and so much more, that he is willing to free me, so that you and I can be happy together yet. Please let me hear from you at once, so we can decide what to do. This is the only reparation we can make. Do not fail to write. Mark has read this. In sorrow, Mabel.

Soon after arriving at her parents' home, the defendant wrote to plaintiff the following letter:

Mark J. Seeds—Sir: I have so fully recovered that I consider myself capable of forming a definite conclusion in regard to my intentions, which are as follows: I shall come down on the evening train, Tuesday, and with your supervision, if you so desire, I shall pack up my personal effects, and bring them up here. I shall probably remain here for some time yet. Do not suppose that I am to be kept in ignorance as to your plans for proceeding against Mr. Williams. It is necessary for me to know all, and although, if you wish, I will willingly discuss this matter with you freely when I see you, let me say this, once for all, I will never testify in court against him, and no matter what his attitude is, I repeat the statement that I shall never believe that he does not love me, unless he tells me with his own lips. It is useless to write more. Please telephone at once whether it will be convenient for you or some one to meet me Tuesday eve. I am well enough to stand the exertion, and it is needless to delay. Shall expect telephone from you Tues. noon. Mabel.

Papa has concluded to take this to you instead of mailing it, so you may send your answer by him. I had just as well come at once and remove my things, for it would only be a source of constant worry if I do not, so I hope it will suit you to let me come Tuesday night. Mabel.

And, apparently in response to this letter, the plaintiff wrote to defendant as follows:

Mabel: Was just talking to you over the phone.

Will now write you. Would to God that I could address you as my heart feels toward you, but you would simply make light of my pleadings and prayers, but you can't keep me from saying 'God bless you.' Oh! how I pity you, you poor girl. What do I care what the world says so long as I know in my heart that you are innocent of doing the one thing all the world believes you have done. I know that although you have lied to me about other things, you are innocent of that. Of course you are more than welcome to those things you spoke of. Tell your mother to be sure & be here for dinner Thursday, & please send down my Bible. Perhaps I can find some comfort in it some place. God knows I have none outside of it. Oh, Mabel, how could you—you of all people—who had such a strong will of your own, be led astray so easily by such a low-down villain as he. Mabel, you think you know him, but God pity you, you do not. Mabel, have I ever accepted any of the tales I heard about him as true? No, not one. You know I have hunted down every one, and can prove every one by good reliable people, not by such as Mrs. Beers & Jos. White. You know I have spared no expense to hunt down everything—only yesterday I paid out $60 cash that I had to borrow just for your sake. He is a drunkard, a gambler, and he simply deceived you and took great chances just for the sake of playing with you. What has he been making frequent trips to Columbus Junction for the last year or two? Ask Mr. Gus Abrahampson, the foreman of the Rock Island bridge gang—he lives here, and goes up & down the road 2 or 3 times every week. But you poor deceived girl, you will simply shut your eyes and not believe anything. You need sympathy, not scolding—God help you—I don't seem to be able to do you any good. I took Atty. McConnel & went to C. Rapids yesterday. We went to Hon. C. A. Christleman, and I told him all about our heart-breaking affair. In the p. m. we invited Mr. Williams to talk with us, and the result is that for your sake this case will never come up in court, unless Mr. Williams brings it up. I have signed papers which Mr. Williams holds—which were signed before two attorneys—that prevent me bringing suit against him for all the great wrong

he has done us.   This much because of the regard I
have for you.   On the other hand, I hold papers over
his signature which will keep him from going very far
from the straight & narrow way of right, for some time.
N. B.   Believe me, you are not mentioned, nor I do
not believe you were even thought of in any way, while
we were arranging the above.   In fact no reference at
all was made as to what he should or should not do
in regard to you in any way.   Now, Mabel, if you are
wise you will be satisfied with this explanation, and I
gave Mr. Williams my promise, while holding tight to
both his hands and both of us crying, that all I would
say to anyone in regard to our settlement was that there
would be nothing more said or done.   Remember, Mabel,
all this for your sake.   Now, if this explanation is not
satisfactory, I will tell you the last thing he said.   When
he left the law office, we shook hands, and as we did so,
he said, 'Mark, you are a man.   I only wish I had
known you before.'   Now remember, Mabel, I did not
simply drop everything against this monster who has
ruined both our lives.   He has certain obligations to
perform which if he fails to do I will not only go after
him, but will publish all his letters, and in fact expose
him in every way I can.   But for the sake of my wife
I told him what I would do, and I dictated terms that
he agreed to.   Thank you for the use of Prince, and
I will bring him up to you any day you wish him bro't.
God bless you.   Good bye.   Your heart broken Mark.
    Show this to your parents, please.

Another letter was written by defendant to plaintiff
a few days later, from her parents' home, the material
parts of which are as follows:

Mark:   I rec'd your letter this morning and will
write a few lines for mamma to deliver to you tomorrow.
I honestly wish, Mark, that I could say something to
make you suffer less, but I don't know what on earth it
would be, for whatever I think of to say to you seems
in the end to be in the nature of excuse for myself,
and of that I have none.   I well know that the failures
I have made all through my life have caused much pain

to those who love me, and I simply wonder now, if it will always be so, or if some time I can prove myself more worthy of what I wish to be. I am glad, Mark, that you have complete faith in my virtue, and I think you know me well enough to rest assured that whatever my faults of another nature might be, and whatever tales the gossips may be pleased to tell you, at least I am not guilty of that, God knows it. Thank you sincerely for telling me about your trip to Cedar Rapids, and the arrangement you made with Mr. Williams. Would it be asking too much of you to write a copy of the papers you hold and send to me? I would be very glad if you would do this, and hope you will grant my request, and I really see no reason why I should not possess a copy. If I do not know just what the agreement is it will be a constant source of worry and curiosity, and if I know all, my mind will be more at rest. Thank you also for allowing me to have those photos, etc. I would not have asked for them (indeed I have no right to ask for anything), but as you have duplicates of them all, I thought you might not care. Well is there anything else to say, I wonder? I am improving in health, and am trying to interest myself in something for the sake of my mind. I have been down to Lew Coppos' twice to play on their piano, and am going to trim Mrs. Coppos' & the children's hats for pay. I send your Bible also by Mamma. Yes, you will surely find comfort there, for there is enough for all, and to suit all cases. I am glad you asked me to send it, glad that you feel the need of it, and because you need it, you will find comfort in it. May God help us all. Mabel.

In the meantime defendant with her mother had visited her husband's home, and after staying overnight, and remaining to dinner the next day, had packed up and taken away with her all her clothing and personal belongings, with plaintiff's full consent, and under the arrangement indicated in the preceding letters. At this time she bade adieu to her children, without any extended conversation with them, though it does not appear whether she had as full opportunity

to talk with them as she desired or not. On two or three subsequent occasions she went to plaintiff's home for the purpose of seeing her children, but was refused permission to do so, and was told not to return, although she was allowed, on other occasions, by previous arrangement with plaintiff to see them at his father's home in Mediapolis. There is testimony by defendant and her father that at some interview, the date and circumstances of which are not very definitely fixed, plaintiff insisted that defendant could return to him only if she came back on her knees, expressing repentance and agreeing to burn her music books, and abjure further association with her Baptist friends. On the other hand, plaintiff testifies that defendant offered to return, but only on condition that she should be allowed to occupy a separate portion of the house as her own, and agreed on that condition to do the best she could for plaintiff and the children. Under the conflicting evidence as to the proposals with reference to defendant's return to plaintiff's home, we are forced to reach the general conclusion that defendant still entertained and professed an affection for Williams, which would prevent her from properly assuming to be plaintiff's dutiful and loving wife, and that plaintiff was unwilling to have her return on any other condition, and that, while plaintiff contemplated the institution of divorce proceedings which would terminate the marital relation between them, defendant was reluctant to consent to such proceedings, and the assumed result thereof, only because it would involve her good name, and that of Williams, and be based on a criminality in their relations which the defendant consistently denied. It does not appear that defendant for many months after the separation had any expectation or desire of resuming her full marital relations with plaintiff, and there is no indication, so far as we have discovered, that the unwillingness of defendant to return was based upon the thought

that she would be improperly treated by plaintiff if she should so return.

During the summer of 1903 letters were written by defendant's attorney to plaintiff, asking that the children be allowed to visit defendant at her parents' home, and subsequently a proceeding by habeas corpus was instituted by this defendant against this plaintiff, in which the right to the custody of the children was asserted by this defendant. In this proceeding both parties testified, and for impeachment purposes they were asked in this case as to what their testimony had been in the habeas corpus case with reference to some material matters. Their testimony in the habeas corpus case, as thus brought into this record substantially by admissions as to what such testimony had been, does not show conditions substantially different from those which we have already indicated as to their attitude, and we reach the conclusion on the whole case that defendant never offered to return to plaintiff's home on conditions which plaintiff, as her husband, was bound to accept, and that, on the other hand, plaintiff has substantially been unwilling, under the conditions as existing, to receive defendant back as his wife.

It should be stated, further, that in December, 1904, Williams died at Cedar Rapids as the result of injuries received in a railroad accident, but it does not appear that, after that time, and within two years of the first separation, either party took any steps toward a reconciliation and resumption of marital relations.

Under the facts as thus set forth, necessarily at some length by reason of the conflicting claims of the parties, we think the law to be applied to the facts as we have found them is clear. The party 3. SAME: desertion: offer to return. at fault in the original separation desiring to resume proper marital relations within two years, and thus prevent the desertion from becoming a statutory ground for divorce, must make a good faith

offer to return, without other conditions than those incident to the proper treatment of each by the other as husband and wife. *Woolard v. Woolard,* 18 App. D. C. 326; *Dwyer v. Dwyer,* 16 Mo. App. 422; *Fishli v. Fishli,* 2 Litt. (Ky.) 337; *Middleton v. Middleton,* 187 Pa. 612 (41 Atl. 291); *McClurg's Appeal,* 66 Pa. 366. The party not at fault need not solicit the return of the other, who has left the home without good cause. It is sufficient if it appears that such party has not refused an unconditional offer to return. *Fitzgerald v. Fitzgerald,* L. R. 1 Prob. and Div. 694; *Ogilvie v. Ogilvie,* 37 Or. 171 (61 Pac. 627); *Hitchcock v. Hitchcock,* 15 App. D. C. 81. "Conduct which in itself is proper can not be made improper by inquiring what he, the husband, would have done in an event which did not happen. A tender under a contract would not be excused by the contractee's subsequent admission that he would not have accepted it if made, provided he had done no overt act of waiver. In general, a person does not lose rights which he may lawfully renounce, until he has renounced them by an overt act. With reference to the present case, we may remark that a contrary doctrine would make a divorce for desertion almost always unattainable without perjury; for, except in unusual circumstances, it is not to be supposed that a libelant (applicant for divorce) would have been willing to receive the libelee back, if the latter had offered to return on the day before the libel was filed." *Ford v. Ford,* 143 Mass. 577 (10 N. E. 474).

We reach the conclusion that the lower court, under the evidence shown in the record, properly granted to plaintiff a divorce from the defendant, and the decree is *affirmed.*