Argued September 23, affirmed November 12, 1919, modified as to costs and rehearing denied February 10, 1920.

# HODLER *v.* HODLER.*

(185 Pac. 241; 187 Pac. 604.)

**Contracts—Contract for Divorce.**

1. Where husband and wife made property agreements "in anticipation of a divorce about to be procured," and where husband facilitated trial of wife's divorce suit by making trip for special purpose of being served, did not appear in suit, and permitted wife to obtain divorce on grounds which he knew to be false, the transaction *held* an agreement by which wife should procure divorce, and as such void as against public policy.

[As to the validity of contracts intended to facilitate procuring divorce, see notes in 11 **Ann. Cas.** 377; **Ann. Cas.** 1915A, 811; **Ann. Cas.** 1918E, 902.]

---

*For authorities discussing the question of validity of anticipatory contract making provision for wife in the event of her obtaining a divorce for subsequent fault of husband, see notes in 23 **L. R. A.** (N. S.) 880, and **L. R. A.** 1918A, 384.

On validity of contract upon condition, or in consideration of procuring divorce, see note in 44 **L. R. A.** (N. S.) 379.          REPORTER.

Pleading — Admissions — Cancellation of Note Executed Pursuant to Collusive Agreement.

2. In divorced wife's action to cancel her note and mortgage to husband upon ground that they were void and without consideration, because executed pursuant to collusive divorce agreement, husband, after asserting validity of agreement and after alleging that in reliance thereon he did not appear or defend divorce suit though he had a valid defense, cannot question court's jurisdiction to render decree of cancellation upon ground that parties are *in pari delicto.*

Contracts—Return of Money Paid Under Collusive Agreement.

3. Court, in canceling divorced wife's note and mortgage to husband on ground that they were executed pursuant to collusive divorce agreement, will not decree return of money actually paid thereon; the contract, as to money paid over, being an executed contract, and wife being without a remedy in regard thereto.

Cancellation of Instruments—Collusive Divorce Agreement—Cancellation of Note and Mortgage.

4. In divorced wife's suit to have note and mortgage to husband canceled upon ground that they were void and without consideration because executed pursuant to collusive divorce agreement, wife *held* entitled to cancellation as against objection that, if note and mortgage were against public policy, no relief should be granted, since wife could successfully defend in suit to foreclose mortgage upon ground that it was void and without consideration.

### ON PETITION FOR REHEARING.

Equity—Jurisdiction Dependent on Facts Existing at Time of Complaint.

5. Jurisdiction of equity must depend on the actual facts as they exist at the time the complaint was filed and the relief which is sought to be obtained by both the plaintiff and the defendant as evidenced by the pleadings.

Cancellation of Instruments — Party to Void Note and Mortgage Though in Pari Delicto, may Sue to Cancel Obligation Before Maturity.

6. Conceding that parties to an agreement, void because a collusive divorce agreement, were *in pari delicto,* equity has jurisdiction to cancel note and mortgage, given pursuant thereto, when suit is brought before the maturity of the obligation; the maker of the note not being sufficiently protected by defense which she might make on the note and mortgage if they were sued on by an innocent purchaser for value.

Costs—Of Transcript Properly Divided Where Plaintiff had Benefit of Transcript Filed by Defendant.

7. Where both parties appealed, and plaintiff had the benefit of the transcript filed by defendant, the costs of the transcript would be divided.

From Multnomah: GEORGE W. STAPLETON, Judge.

In Banc.

The plaintiff and the defendant Louis Hodler were intermarried in 1898 and lived together as husband and wife until about January 1, 1915. They have two sons, one about sixteen years old and the other about eleven.

In 1903 the plaintiff inherited from her mother 187.5 acres of land near Beaverton in Washington County, Oregon, together with some property in the City of Portland and about $25,000 in money. The plaintiff alleges that although the defendant Hodler was a strong, healthy man, after she received this legacy he led a life of ease and idleness and was fed and clothed out of the income from her property; that he manifested toward her a cruel, overbearing and vicious disposition and insisted upon managing her property, collecting the rents and controlling the expenditures.

The complaint narrates that prior to 1914 the Hodlers became acquainted with A. B. F. Orr; that after the death of Orr's wife Hodler agreed with Orr that the latter should become a boarder in the Hodler household; that Orr invited the plaintiff and her husband to take a trip east with him, which they did at his expense; that upon their return the plaintiff informed Orr that she did not want him to remain in her home, but Hodler insisted that he should continue to reside there. The plaintiff avers that some time in the summer of 1914 she first learned that Hodler had a child in the east, by a former marriage, and at that time Hodler's cruel treatment of her became aggravated; that he accused her of prying into his affairs and insisted that she should pay him $40,000, threatening that he would not leave without a settlement; that he told the children their mother was unchaste and had been guilty of immoral relations with Orr on the trip; that as a re-

sult of his treatment and such charges the plaintiff became almost a wreck, mentally and physically, and in the fall of 1914 she asked Hodler to leave her house, where he had been living, and that he refused to go and schemed to compel her to pay him at least $20,000, with threats that unless she did so he would publish in the "Morning Oregonian" a statement of her alleged meretricious conduct.

It is further stated in the complaint that upon the failure of Hodler to leave, the plaintiff left her own home; that through duress, on account of her children and to save her good name she agreed to pay Hodler $20,000; that pursuant to such agreement the parties met at the office of Attorney MacMahon in Portland on January 8, 1915, and entered into the following contract:

"This agreement, made and entered into this eighth day of January, 1915, by and between Mr. Louis Hodler and Mrs. Delia Hodler, at present husband and wife, both of the State of Oregon, witnesseth:

"That whereas the parties hereto are the owners in fee simple of realty situate in the County of Washington, State of Oregon, and in the County of Multnomah, State of Oregon, and also personalty;

"And whereas, certain estrangements have arisen between them and disagreements during the past years which appear to be inevitable and irreconcilable;

"And whereas, they have not for many years lived together as husband and wife, and are not now living in said marital relations;

"And whereas, there have been born to the parties hereto two minor male children, Albert, of the age of 16 years, and Joseph, of the age of 13 years, both now under the care and custody of the parties hereto;

"And whereas, it is desired by the parties hereto that they should save the cost of litigation and the expense incurred by anticipated litigation in the division

of said property for the benefit of their said minor children as well as for their own benefit;

"Therefore, in anticipation of a divorce about to be procured by one of the parties hereto on the merits to be set forth in said complaint, upon which this agreement has no bearing whatever, now, therefore, we, the said Louis Hodler and the said Delia Hodler hereby agree to divide our property and to settle our property rights completely in the following manner, to wit:

"First: Mrs. Delia Hodler hereby agrees to sign, set over and deliver to said Louis Hodler a certain promissory note and mortgage properly secured on property situate in the city of Portland, State of Oregon, in the sum of three thousand dollars ($3,000.00) executed by Joseph J. Tierney to said Delia Hodler;

"Second: Said Delia Hodler further agrees that when these papers are taken from escrow to pay to said Louis Hodler the sum of one thousand dollars ($1,000.00) in gold coin of the United States of America;

"Third: Mrs. Delia Hodler further agrees that upon the delivery of said papers to make, execute and deliver to said Louis Hodler her certain promissory note, secured by a mortgage payable on or before three years from date hereof, drawing interest at the rate of seven (7%) per cent per annum, said note to be secured by a mortgage upon her property consisting of one hundred and eighty-seven and one half (187½A.) acres formerly owned by Patrick Forrester, situate in the Lassen Donation Land Claim in the County of Washington, State of Oregon; interest on said mortgage to be paid annually; said note and mortgage to be made in the sum of sixteen thousand dollars ($16,000.00);

"In consideration of the foregoing gifts and mortgage notes and moneys above set forth, said Louis Hodler hereby agrees that when these papers are taken from escrow, to make, execute and deliver in return for said twenty thousand dollars ($20,000.00) aforementioned, his quitclaim deeds to all property owned by the said Mrs. Delia Hodler and said Louis Hodler

in the County of Washington, State of Oregon, and also in the County of Multnomah, State of Oregon;

"And it is hereby agreed by and between the parties hereto that this agreement shall be final and shall be a complete settlement of all their property rights owned by and between the parties hereto;

"And it is further agreed that these papers shall be executed in duplicate and the same shall be placed in escrow in the bank of Ladd & Tilton in the city of Portland, Oregon, signed by the parties hereto, and that said escrow shall not be removed from said bank without the consent of Delia Hodler, Louis Hodler and their attorney, M. J. MacMahon, ensemble; that is, when the three aforementioned persons appear at the bank and ask for them together;

"It is further agreed by and between the parties hereto and thoroughly understood that after the decree of divorce shall have been entered between the parties hereto dissolving forever the bonds of matrimony existing between them, that the execution of said deeds and the payment of said money and the execution of said mortgage note shall be executed and delivered to the respective parties hereto within a reasonable time after the entrance of said decree of divorce, to wit, five or ten days.

"This agreement is made, executed and placed in escrow by and between the parties hereto in duplicate on this eighth day of January, 1915.

                                    "Louis Hodler.
                                    "Delia Hodler.

"Witnesses:
        "M. J. MacMahon.
        "L. B. Hague."

On January 30th next the foregoing agreement was modified as follows:

"Know all men by these presents: That whereas heretofore, on January 8, 1915, the parties hereto, Mr. Louis Hodler and Delia Hodler, entered into an agreement regarding the division of their property, and whereas said agreement has been placed in escrow in

Ladd & Tilton Bank, Portland, Oregon, and whereas said agreement recites that the parties have not for '*many* years' lived together as husband and wife, and whereas Louis Hodler makes objection to the statement that they have not lived together 'many years' and whereas the estrangement mentioned in said agreement has existed for a period of a little over one year prior to January 8, 1915; it is therefore agreed that said statement of facts in said agreement be, and the same is hereby corrected and amended, so that the sentence reciting said facts shall read as follows: 'and whereas they have not for a year last past lived together as husband and wife, and are not now living in said marital relation.'

"It is further agreed between the parties hereto that the said Delia Hodler shall, at her own cost and expense, suitably support and educate and maintain the two minor children of the parties hereto during the minority of such children and during the minority of the younger thereof. It is further agreed that the said Delia Hodler will protect and save harmless the said Louis Hodler from any liability arising out of and because of the signing of any notes or other evidence of indebtedness by the said Louis Hodler, in connection with the purchase of any real estate now standing in the name of the said Delia Hodler.

"In witness whereof, parties have hereunto set their hands this 30th day of January, 1915.

"DELIA HODLER.<br>"LOUIS HODLER.

"Witnesses:
    "M. J. MACMAHON.
    "FRANK SCHLEGEL."

Pursuant to the original agreement, the plaintiff commenced a suit for divorce against the defendant Louis Hodler in the Circuit Court of Clatsop County, on the ground of cruel and inhuman treatment. A copy of the complaint and summons was duly served on the defendant in Multnomah County. Thereafter

Attorney MacMahon drafted a letter to the sheriff of
Clatsop County and gave it to Hodler, who personally
delivered it to that officer, by whom he was again served
with another copy of the summons and complaint in
that county. The defendant did not appear in the
divorce suit. After a default was taken a reference
was made and the testimony in the Clatsop County suit
was taken by the court reporter of that county, in the
office of Attorney MacMahon in Portland. The plain-
tiff and Clara Wenger, a niece of the defendant Hodler,
gave strong evidence of facts and circumstances tend-
ing to prove the allegations of the complaint, to the
effect that the plaintiff had a just ground of complaint
against the defendant upon the charge of cruel and in-
human treatment. Based thereon a decree of divorce
was rendered by the Circuit Court of Clatsop County
in favor of the plaintiff as prayed for in her complaint.

After the decree was entered, pursuant to the escrow
agreement the parties met and with Attorney Mac-
Mahon went to the Portland bank, where $1,000 in cash
was actually paid over to Hodler and an assignment of
the Tierney note and mortgage for $3,000 was duly
made to him by the plaintiff. She then executed in his
favor her promissory note for $16,000 dated February
1, 1915, payable on or before three years from date,
with interest at 7 per cent per annum, together with a
mortgage upon the 187.5 acre tract of land to secure
the payment thereof. Soon afterward Hodler indorsed
the $16,000 note and mortgage and assigned them to
the defendant Eliza Stone, to whom the plaintiff made
certain payments of interest thereon during the first
year after execution, to the amount of $1,120. The
Tierney note was collected and the proceeds thereof,
together with the $1,000 cash, were turned over to the

defendant Elizabeth Wenger by the defendant Louis Hodler. The complaint states that there was no consideration for the assignment of the $16,000 note and mortgage to the defendant Eliza Stone, but that at the time the plaintiff made .her payments of interest thereon she did not have any knowledge of that fact and assumed that the defendant Stone was the owner and holder thereof for value. It is also alleged that the defendant Elizabeth Wenger now holds the $1,000 and the proceeds of the Tierney note and mortgage in trust for the use and benefit of the defendant Louis Hodler, who is the owner thereof.

The plaintiff contends that the $4,000 evidenced by the cash payment, the Tierney note and mortgage, and the $16,000 note and mortgage were wrongfully and unlawfully obtained from her by duress, under threats as stated and by means of cruel and inhuman treatment, and that the whole transaction is void and without consideration. She avers that after the money, notes and mortgages were obtained the defendant. Hodler commenced an action against Orr for alienation of the affections of his former wife, the plaintiff Delia Hodler, in which he made the threatened charges and caused them to be published.

It is further alleged that at the time the plaintiff and this defendant were married Hodler had a wife and child whom he had deserted in the east, and he had never been divorced from that wife.

There are three separate causes of suit and the plaintiff asks for a decree rescinding the original agreement and the modification thereof; that the $16,000 note and mortgage be canceled; that the defendant Hodler be required to return the $4,000, which he received, and that the defendant Stone be ordered to return the $1,120.00 paid her as interest by the plaintiff.

For answer Louis Hodler admits that he and the plaintiff were intermarried in 1898, and lived together as husband and wife until January 30, 1915; that on January 10, 1915, plaintiff instituted a suit for divorce against him in Clatsop County, Oregon, and that on January 30, 1915, the court rendered a decree of divorce in favor of plaintiff. He admits the execution of the contracts and affirmatively alleges that the plaintiff was not acting under any duress, undue influence, fraud or deceit of the defendant; that she was acting upon her own volition, and under the advice of her attorney; that she realized and understood that the agreements provided for a full settlement and division of the property and property rights between herself and this defendant to avoid litigation of such property rights, and the divorce proceedings; and that Frank Schlegel, who is now one of the attorneys for the plaintiff in this suit, appeared for and represented this defendant in the consummation of the agreements and the execution of the mortgage. He also admits that he did not appear in the divorce suit in Clatsop County; that in February, 1915, he filed a suit in Multnomah County, Oregon, against Orr for the alienation of plaintiff's affections, and that in February, 1917, he instituted another suit for the same purpose at Vancouver, in the State of Washington.

This defendant further admits that he assigned the note and mortgage to the defendant Eliza Stone, his ownership thereof, and the payment of $1,120 thereon as interest.

The answer admits that Louis Hodler was legally married to Emma Roe on October 1, 1885, in Jones County in the State of Iowa, and that a daughter was born as the issue of such marriage. It is affirmatively alleged that on November 21, 1888, his then wife, Emma

Hodler, was duly and legally divorced from him by a valid decree rendered in a suit in which she was plaintiff in the State of Iowa; that on January 13, 1896, he instituted a suit for divorce in the Circuit Court of the State of Oregon for Yamhill County against the said Emma Hodler; that findings of fact and conclusions of law were rendered therein and that based thereon, a decree of divorce was rendered in his favor against Emma Hodler.

Louis Hodler contends that the contracts between the plaintiff and himself were duly and legally carried out and acquiesced in by both parties until this suit was commenced, and that he has at all times and in all respects complied with and performed his part of the contracts, which he claims were fair and reasonable. He admits the execution of the supplemental agreement of January 30, 1915, and alleges that the notes and mortgage were executed pursuant to the terms of that contract and were founded upon a sufficient consideration, but denies all other material allegations.

As an affirmative defense, it is alleged that Louis Hodler frequently protested to the plaintiff against the presence of Orr in the family home, demanding that he should leave, and many times ordering him away, but that the plaintiff insisted that Orr should remain, and that Orr did remain until a short time before the divorce of plaintiff and defendant. He then alleges certain conduct between Orr and the plaintiff which led to the estrangement of plaintiff and defendant, and that the plaintiff determined to secure a separation from this defendant although it was against his wish and protest.

Hodler avers that on account of her relations and conduct with Orr, the plaintiff lost her love and respect for the defendant; their domestic affairs became

strained, and it was impossible for them any longer to live together as husband and wife; that by reason thereof, a division of property and property rights became necessary and to settle and adjust such rights so that a divorce suit could be instituted and prosecuted without the necessity of litigating property rights, she proposed a final settlement of such property rights; that pursuant thereto the agreement marked "Exhibit 'A' " was executed, which was thereafter modified by the supplemental agreement known as "Exhibit 'B' "; and that on January 30, 1915, the plaintiff secured the divorce in question.

The defendant Hodler further alleges that the conduct of plaintiff and Orr caused him humiliation and disgrace, and afforded him sufficient grounds to institute and maintain a suit for divorce against the plaintiff, specifically alleging such grounds. He also alleges that after plaintiff demanded a separation and division of the property, and after he had been advised by her that they could not live together any longer, he went to the office of her attorney where the contracts were drawn, and employed Frank Schlegel, now one of the attorneys for plaintiff, "to look over the agreements and protect his interests therein, and paid him a fee of $100 for said services." The answer further alleges:

"That at the time of the execution of said agreement, immediate divorce proceedings were contemplated by these parties and that thereafter, to wit, upon the tenth day of January, 1915, this plaintiff, then a resident of Multnomah County, Oregon, filed and instituted in the Circuit Court of the State of Oregon, for Clatsop County, a suit for divorce against this defendant and that thereafter, to wit, on January 30, 1915, the court heard evidence in said case and filed his findings of fact

and conclusions of law and entered a decree therein divorcing this plaintiff and this defendant.''

In the divorce suit, according to the defendant, it was understood that all property rights had been settled out of court,

''and this defendant entered no appearance therein and believed that the agreements hereinbefore referred to in reference to the division of the property and the property rights were valid, binding and conclusive. * * ''

Upon the execution of the documents and contracts they were placed in escrow in a Portland bank, where they remained until the divorce decree was rendered, after which they were delivered to the respective parties.

It is further alleged:

''That the actions and associations between this plaintiff and the said Orr afforded abundant grounds for a decree of divorce in favor of the defendant and that at that time the plaintiff was possessed of property real and personal in her own right of the probable value of $75,000.

''That this defendant entered no appearance in said suit and allowed a default to be taken against him relying and believing that the agreements hereinbefore referred to in reference to the division of the property and the settlement of the property rights were valid, binding and conclusive and could and would never be assailed by this plaintiff but that she would in all respects abide by, live up to and conform to the terms of said contracts.

''That if he had any reason to believe or did believe or suspicion that said agreements marked Exhibits 'A' and 'B' were not final and conclusive and were not, in fact, a complete and final settlement of all property and property rights between plaintiff and the defendant, he would have appeared and filed an answer in said divorce suit and filed a cross-complaint alleging

grounds hereinbefore mentioned and others for the purpose of securing a divorce, for the purpose of adjusting the property rights and for the purpose of securing the advantage of any property rights authorized under the laws of the State of Oregon.''

Facts are then alleged tending to show that the plaintiff accepted and ratified the terms and conditions of such contract and undertook in good faith to carry them out; that for more than two years she has recognized them as valid and binding, and has not placed or offered to place the defendant *in statu quo.*

Further, the defendant alleges the commencement of the divorce suit in Clatsop County, and the rendering of decree therein, and prays for a decree:

''That the contracts and mortgages hereinabove alleged and alleged in plaintiff's complaint be held and decreed to be valid and binding and that this suit be dismissed and that this defendant recover his costs and disbursements in this suit from this plaintiff and for such other and further relief as may appear to the court to be equitable in the premises.''

Answers were filed by the defendants Eliza Stone and Elizabeth Wenger denying all material allegations of the complaint.

The plaintiff replied, denying all the new matter alleged in defendant Hodler's further and separate answer, and alleging certain other matters by way of defense. All the testimony was taken in open court before the judge, who made exhaustive findings of fact and conclusions of law, upon which he rendered a decree setting aside as null and void the $16,000 note and mortgage, and the assignment thereof, refusing the plaintiff a decree for the money which she had already paid under the contracts, and ordering that each party should pay his or her own costs.

The plaintiff appealed, claiming that she was entitled to a decree for the $5,120 which she had actually paid, and the defendant Hodler appealed on the ground that the court erred in refusing to quash the service of summons; that his demurrer to the complaint should have been sustained; that the suit was not commenced within the time limited by the Code; that the complaint does not state facts sufficient to constitute a cause of suit; that it appears that the plaintiff has ratified the contracts, note and mortgage and waived the alleged duress, and that the court did not have jurisdiction of the subject matter of the suit; that it erred in refusing to decree that the $16,000 note and mortgage were valid and binding and that plaintiff ought to be estopped from claiming or asserting that the contracts were executed under duress or were void; and that the plaintiff should have no decree whatever.        AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. Thomas Mannix, Mr. Guy L. Wallace* and *Mr. Frank Schlegel.*

For cross-appellant there was a brief with oral arguments by *Mr. E. B. Tongue* and *Mr. Thomas H. Tongue.*

JOHNS, J.—This has been a bitterly contested suit, and the record is full of crimination and recrimination, but as we read it neither of the Hodlers could qualify to cast the first stone. The defendant admits that he was married in Jones County, Iowa, to Emma Roe on October 1, 1885; that they lived there as husband and wife, and that a daughter was born to them; that in about one year he left his family and came to Beaverton, Washington County, in this state, and that he has never since seen that wife and child. He alleges that

Emma Roe Hodler obtained a divorce from him in Iowa on November 21, 1888, and it appears that soon thereafter she married his brother. He also alleges that on January 13, 1896, he instituted a suit for divorce against her in the Circuit Court of the State of Oregon for Yamhill County, in which findings of fact were made and a decree was rendered in that court on April 14, 1896, divorcing him from his former wife, Emma Hodler.

The plaintiff and the defendant Louis Hodler were married at Vancouver, Washington, in 1898. At that time Hodler claims that she knew and plaintiff denies that she had any knowledge of his former marriage, or that he had a daughter. It is significant that while he was then a resident of Beaverton in Washington County he filed his complaint and obtained his divorce in Yamhill County.

At the time of their marriage, the plaintiff and defendant were without substantial means, and both were hard-working people and made their home in the country. In 1903, through her mother, the plaintiff became the exclusive owner of the Washington County farm of 187.5 acres, together with some property in Portland, Oregon, and a substantial amount of money known as the ''Pat. Forester estate,'' and in a short time they both moved to Portland, where they continued to reside. Up to 1913, their domestic relations were fairly pleasant and they were reasonably happy.

Upon the death of his wife, A. B. F. Orr became a boarder in the Hodler household, and invited the husband and wife to take an eastern trip which it was understood would be at his expense. It was upon that trip that their domestic trouble commenced, with Orr as the storm center. On their return, he continued to reside with them and their domestic troubles increased

from time to time until they finally culminated in the execution of the agreements and the filing of the divorce suit in Clatsop County by the plaintiff upon the grounds of cruel and inhuman treatment. The plaintiff vigorously contends that she did not want Orr in the home, and frequently notified him to leave, but that her husband objected to his leaving and insisted that he should stay. The defendant as vigorously contends that he did not want Orr around the house and several times notified him to leave, and that his wife insisted that he should remain. In either event it is apparent that Orr was largely responsible for the domestic trouble between the Hodlers. By mutual consent, the plaintiff and the defendant Louis Hodler together went to the office of Attorney MacMahon in the City of Portland, where the agreement known as "Exhibit 'A'" was prepared and executed on January 8, 1915. Following the execution of that agreement, the plaintiff went to Astoria in Clatsop County and filed her complaint in the divorce suit. The complaint and summons were first served upon Louis Hodler by the sheriff of Multnomah County, following which Attorney MacMahon drafted a letter to the sheriff of Clatsop County, which he delivered to Louis Hodler, who was then in Portland, and who personally went to Astoria and delivered the MacMahon letter to the sheriff of Clatsop County, by whom Louis Hodler was again duly served in the office of that sheriff with another copy of the complaint and summons in the divorce suit.

Hodler did not appear in the divorce suit and a default was entered against him. It is apparent that his purpose in going to Astoria and the making of the second service was to facilitate the trial of the case and the obtaining of the decree of divorce.

After the default was taken, both parties returned to Portland where the testimony was taken in Mac-Mahon's office before the reporter of the Circuit Court of Clatsop County as referee, with the plaintiff and Clara Wenger, a niece of the defendant, as the only witnesses, and each of them gave strong testimony tending to show that the defendant had committed numerous acts of cruel and inhuman treatment towards plaintiff and that she had been a dutiful and faithful wife. Based thereon, the Circuit Court of Clatsop County, rendered a decree in favor of the plaintiff. After its rendition and by mutual consent, the plaintiff and defendant with Attorney MacMahon went to the bank where the papers were placed in escrow pending the suit, and the deeds from the defendant to the plaintiff were duly executed and delivered, and plaintiff then paid the defendant $1,000 in cash and assigned the Tierney note and mortgage of $3,000, and executed the $16,000 note with a mortgage on the Washington County land to secure its payment, all of which were delivered to the defendant, and the whole transaction was apparently closed until about the time this suit was commenced. At its maturity, the plaintiff was notified by the attorney for Mrs. Stone to pay the annual interest of $1,120 on the $16,000 note. After some delay, the plaintiff paid that interest to Mrs. Stone under the alleged belief that she was the actual owner and holder of that note and mortgage. But it is admitted in the pleadings and appears from the evidence that the defendant Louis Hodler was then and is now the true owner and that Mrs. Stone held the assignment thereof in trust for him.

While we agree with the trial court that there is much perjured testimony in the record, there is no dispute as to the execution of any of the instruments or why

they were executed, or as to the obtaining of the divorce, the grounds and the reason for it or the manner in which it was obtained. Hodler claims that the contract of January 8, 1915, as modified by the parties on January 30th of that year, was a separation agreement only, and as such was valid. The plaintiff now contends that it was procured by duress, was conditioned on the obtaining of the divorce, was intended to promote and facilitate the divorce and is void as against public policy. That is the vital question in this case. In 9 R. C. L., page 252, it is said:

"Marriage is a relation in which the public is deeply interested and is subject to proper regulation and control by the state or sovereignty in which it is assumed or exists. The public policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together, and to prevent separation."

1. Under the earlier decisions even separation agreements between husband and wife were held to be void as against public policy, but under the modern decisions, when fair and reasonable such agreements are now sustained. As we analyze it, the whole transaction between the plaintiff and Louis Hodler was an agreement between them by which the plaintiff should procure a divorce.

The defendant Hodler alleges in his answer that "at the time of the execution of said agreement immediate divorce proceedings were contemplated by these parties," and the divorce suit was filed on January 10, 1915. To facilitate the trial Louis Hodler went from Portland to the sheriff's office at Astoria for the express purpose of being served with a copy of the summons and complaint in Clatsop County, and did not enter any appearance in the suit. His own niece, who

for a number of years had lived with the litigants in their family home, was an important witness for the plaintiff and testified as to specific acts of cruel and inhuman treatment of the plaintiff by the defendant Hodler, on the strength of which the decree was granted.   This defendant further alleges that he "entered no appearance therein and believed that the agreements hereinbefore referred to in reference to the division of the property and the property rights were valid, binding and conclusive," and that if he had "had any reason to believe or did believe or suspicion that said agreements, 'Exhibits "A" and "B," were not final and conclusive and were not in fact a final settlement of property and property rights between plaintiff and the defendant, he would have appeared and filed an answer in said divorce suit and filed a cross-complaint alleging grounds hereinbefore mentioned, and others, for the purpose of securing a divorce." The statement as to "grounds hereinbefore mentioned" has reference to the alleged adulterous acts and meretricious conduct between the plaintiff and Orr, and the alleged cruel and inhuman treatment of the defendant by the plaintiff.   Hodler now contends and it appears from his own evidence in this suit that he was a kind, faithful and loving husband, and that he never abused or mistreated the plaintiff.   He declares that she never had any grounds for a divorce on account of cruel and inhuman treatment or otherwise, and his niece testifies in the pending case that she committed perjury in all her testimony in the divorce suit as to the grounds upon which the decree was obtained.   In other words, assuming that the evidence and contentions of the defendant in the pending case are true, the plaintiff never had any ground for divorce, but Hodler

had abundant cause for a divorce from her, both on account of cruel and inhuman treatment and because of her meretricious relations with Orr. Yet with knowledge of such facts and in consideration of the $20,000 which he expected to secure, he permitted the plaintiff to obtain a divorce from him on grounds which he knew to be false.

The rule is well stated in 9 R. C. L., page 254, that:

"A husband and wife cannot enter into a lawful agreement for a divorce, and the courts unhesitatingly declare illegal as contrary to public policy any contract intended to facilitate or promote the procurement of a divorce. Hence a contract whereby a wife who has resolved to leave her husband agrees for a stated consideration to relinquish all claims on him as wife provided a divorce is granted to him on or before a fixed date is void and no bar of her right to a year's support and dower after his death. Nor can an agreement to withdraw opposition to or not to contest divorce proceedings form a valid consideration for a contract to pay money. * * Similarly a contract between a husband and wife is invalid where its direct tendency is to interest the husband in procuring a divorce or in foregoing resistance to an effort by his wife directed to that end."

Greenhood on Public Policy, page 490, lays down the rule thus:

" 'It is quite settled,' said the court, in Case I, 'that contracts between husband and wife, so framed as to have effect only on condition that a divorce should be granted, are contrary to public policy, and will not be enforced by the courts. Their tendency is to interest the parties to be benefited in procuring or permitting a divorce; and, though chancery will recognize and enforce some liabilities between husband and wife growing out of implied trusts, and even some growing out of express contracts, yet the courts will never lend themselves to the enforcement of a contract intended to promote the dissolution of marriage. * * Such an

agreement is regarded in law as a fraud upon the court and upon the administration of justice, and no action will lie upon it.' "

And on page 491 it is said:

" 'The object of the agreement,' said the court, in Case III, 'was to bring about a dissolution of the marriage contract, and to put an end to the various duties and relations resulting from it. Any contract, having any such purpose, object, and tendency, cannot be in law sustained, but must be regarded as being against sound public policy, and consequently illegal and void.' "

In *Phillips* v. *Thorp,* 10 Or. 494, the syllabus holds that:

"The authorities are uniform in holding that any agreement between the parties having for its object the dissolution of the marriage contract, or facilitating that result, such as an agreement by the defendant in a pending action for divorce, to withdraw his, or her opposition, and make no defense, is void, as *contra bonos mores.*

"Such agreements are a fraud upon the law which favors marriage, and will not give its sanction nor lend its aid to uphold or enforce the terms of any contract, nor countenance any contrivance which is designed to promote its dissolution."

The opinion there, by Mr. Justice LORD, cites and quotes from the early case of *Adams* v. *Adams,* 25 Minn. 72, 79, in which it is said:

"The authorities are uniform in holding that any contract between the parties, having for its object the dissolution of the marriage contract, or facilitating that result, such as an agreement by the defendant in a pending action for divorce, to withdraw his or her opposition, and to make no defense, is void, as *contra bonos mores,* and that any note executed in consideration and pursuance of any such agreement, is without valid consideration, and void."

The Adams case was a suit to recover upon:

"One of several negotiable promissory notes which were given by the defendant to the plaintiff, at the same time, and upon one and the same entire consideration. They all originated in the same transaction, having been given in pursuance of an alleged illegal agreement, entered into between the parties while they were husband and wife, for the purpose of procuring a divorce between themselves, in an action then commenced by the plaintiff against said defendant. The defense interposed and relied on in this action is this alleged illegality in the consideration of the note, it being claimed that said agreement was void as against public policy."

The plaintiff there contended that the defendant was precluded from impeaching the validity of the note sued upon by showing that it was given in pursuance of a void agreement, because he was a party standing *in pari delicto*. It was there conceded that—

"The note in question was given in pursuance of the written agreement, and to carry out its provisions. It was, in fact, a part of the agreement, resting wholly upon its validity for support, and the plaintiff now asks the aid of the court in enforcing it. The point is not well taken."

The opinion further says:

"Testing the agreement in question by these principles, it was clearly illegal and void as against public policy, and the decision of the court in regard to its validity was right. At the time the agreement was entered into, the parties were still husband and wife. It contemplated the fact that divorce proceedings had already been or were about to be instituted by the plaintiff against the defendant, for the purpose of procuring a dissolution of their marriage relations. By its terms, defendant agreed to pay her one thousand dollars down, to execute his four promissory notes, for $1,000 each, with security, and to place the same, to-

gether with other property, in the hands of a third party, to be delivered to her upon the happening of the event therein provided, as hereinafter stated. * * The agreement expressly provides that said notes and other property so placed in escrow are 'to be delivered to her when she shall have obtained a decree of divorce' from her said husband, the defendant, and not before.''

The case of *Muckenburg* v. *Holler,* 29 Ind. 140 (92 Am. Dec. 345), discussing a similar contract, said:

''Its direct tendency was to interest the present plaintiff in procuring a divorce, or in foregoing resistance to an effort by his wife directed to that end. The marriage relation is not thus to be tampered with, and the courts, by contract of the parties, converted into mere registers of their agreements for separation from the bonds of matrimony. The law favors marriage, and cannot therefore sanction contracts intended to promote its dissolution by lending itself to their enforcement.''

*Palmer* v. *Palmer,* 26 Utah, 31 (72 Pac. 3, 99 Am. St. Rep. 820, 61 L. R. A. 641), is an exhaustive case, in which the court there said:

''Moreover, where, as appears in this instance, the parties agree that the one shall bring a suit to dissolve the marriage, and that the other will make no defense, or a mere nominal defense, which is indicated by the context, the agreement becomes collusive and fraudulent, and is without validity. A contract of this character may be regarded as a fraud upon the court, and it comes within the reason of the maxim, '*ex turpi causa non oritur actio.*' * * The welfare of humanity, the intelligence and progress of the human race, high moral and social ethics, alike demand this. Any other method or device by which the contracting parties attempt to sever or to facilitate the severing of the bonds of matrimony, in the eye of the law, contravenes public policy, is regarded as *contra bonos mores,* and is void and ineffectual. Therefore a contract which is designed to facilitate the procurement of a divorce, to put an end

to the marriage status, and absolve parties from all their marital obligations, imposed upon them by the law of matrimony, cannot be enforced.''

Numerous authorities are cited in the opinion, to the effect that—

''Courts will not enforce any contract which is the price of consent by one party to the marriage relation to a procurement of a divorce by the other.''

In 9 Cyc., page 519, we find the following:

''If the object of a contract is to divorce man and wife the agreement is against public policy and void. * * To induce a wife to sue for a divorce by a promise on the part of the husband to remunerate her for it, or for a husband and wife to agree that one of them shall bring a suit for a divorce and the other shall not defend, is against the law which recognizes and upholds the sanctity of marriage and is void.''

Under such authorities and the facts disclosed by the record, the divorce decree rendered by the Circuit Court of Clatsop County was a fraud upon that court and the contracts between the plaintiff and the defendant were null and void as against public policy.

The trial court found as conclusion of law No. 5:

''That the plaintiff and defendant Hodler are *in pari delicto,* but not in the same degree, Hodler being the more guilty party to the aforesaid contractual transactions and the execution of said note and mortgage.''

The testimony was taken in open court and the case was bitterly contested. The trial judge saw the witnesses and in many instances took an active part in their examination. The record is voluminous, covering over thirteen hundred typewritten pages, including numerous exhibits. The question as to the actual blame which should be placed upon each party is largely one of fact, and under all the circumstances we

think that the opinion of the trial court is entitled to some weight. While as to all other matters exclusive of the written contracts, "Exhibits 'A' and 'B,'" it may be true that the Hodlers were both *in pari delicto,* it is not true as to "Exhibit 'B'" in particular. In that contract Hodler was the moving party; he showed a mercenary disposition and undertook to drive a hard bargain, seeking to be relieved of the support and maintenance of the minor children and to thrust that burden upon the mother of his own offspring. Except to purchase a suit of clothes for one of them, it appears from his own evidence that Hodler has not contributed a dollar to the support of his children since the plaintiff procured her divorce. Again, the only interest which Hodler ever had in the real property involved was an inchoate right of curtesy. The plaintiff was the exclusive owner in fee simple of the realty by a conveyance from her mother, and the title was not acquired by their joint efforts. The only claim thereto which Hodler could assert was for the value of his labor and services in the management and improvement thereof while he and the plaintiff were husband and wife. We quote from the opinion of the trial court:

"All she [the plaintiff] has in pursuance of the contract and in accordance with its terms is the quitclaim deed from Hodler to his interest in her lands, which deed conveyed nothing, as he had no interest in her lands."

In the execution of that contract Hodler was more than equally guilty with the plaintiff. "Exhibit 'B'" was executed after they were divorced and that fact strongly supports the contention of the plaintiff that even then she was acting under fear and duress.

Taken as a whole, the complaint states a cause of suit for the cancellation of the $16,000 note and mort-

gage and a return of the money paid. The first and third grounds are largely founded upon duress, but the allegations are broad enough to sustain a decree that the $16,000 note and mortgage should be canceled upon the ground that they were void and without consideration.

2. Assuming that the allegations of duress are not sustained by the evidence and that the parties were *in pari delicto*, the defendant Hodler admits the execution of the respective contracts and that the divorce was obtained pursuant thereto. In addition he pleads affirmative defense tending to show that the agreements were supported by a good and valid consideration; that they were executed in good faith; that he relied thereon; that the plaintiff acquiesced therein for about two years and paid the annual interest on the $16,000 note, and that she ought now to be estopped to claim or assert that the note and mortgage were null and void. He alleges that he advanced moneys to and performed labor and services for the plaintiff which would constitute a valid consideration for the contracts; that he had a valid defense to the divorce suit, but that in reliance upon the agreements he did not appear or make any defense. As affirmative relief he prays for a decree that the $16,000 note and mortgage be declared valid and binding and for ''such other and further relief as may appear to be equitable in the premises.'' Since he has made such admissions, pleaded such defenses, asked for such affirmative relief and tried the case on such issues, we are of the opinion that the defendant cannot question the jurisdiction of the court to render a decree of cancellation upon the ground that the parties are *in pari delicto*.

This is not a suit in which the plaintiff seeks to recover upon or enforce a contract which is void as

against public policy. It is brought to cancel a note and mortgage of record alleged to have been procured through fear and duress and to be void and without consideration. Here Hodler as a defense claims and alleges that the note and mortgage are legal and supported by a good consideration, and prays for a decree that they be declared valid and binding. Both parties submit themselves and the subject matter of the suit to the jurisdiction of the court and pray for equitable relief. As said in *Leadbetter* v. *Hawley,* 59 Or. 422, 424 (117 Pac. 289, 290):

"The plaintiff is in court, not in favor of his agreement, but in spite of it; not to enforce it, but to be relieved from it. * * * A contract becomes executed when all is done that the terms require to be performed. Until that situation is attained, the contract is executory."

3. The real essence of the contract was that in consideration of her payment of $20,000 to Hodler the plaintiff should have a divorce from him. In legal effect $4,000 of that amount was paid at the time of the execution of the contract, and the remaining $16,000 was evidenced by a promissory note dated February 1, 1915, to be paid on or before three years after date, with interest. As to the money which was actually paid, it was an executed contract. As to the money which was to be paid as evidenced by the promissory note, it was an executory contract and would not become fully executed until the whole amount of the $16,000 note was actually paid. With regard to all moneys which were paid over by the plaintiff under the terms of the contract, she is without a remedy. To that extent this is an executed contract.

4. Defendants' counsel contend that if the $16,000 note and mortgage are void as against public policy,

the suit should be dismissed, citing and relying upon the case of *Horseman* v. *Horseman,* 43 Or. 83 (72 Pac. 698), where the rule is laid down that—

Equity "will not enforce a specific performance relative to the conveyance of the homestead, neither will it require a surrender or cancellation of the unpaid note and mortgages, or interfere to relieve against the condition in which the parties have voluntarily placed themselves."

In that case the plaintiffs were the moving parties and sought the specific performance of a contract which the court found was against public policy, and the defendants made a general denial, pleading no affirmative defenses nor asking for a decree that the contract be declared valid and binding.

In the pending suit it must be conceded that the validity of the note and mortgage is the real issue. It is the plaintiff who seeks to have them canceled, and Hodler who wants them declared valid. In a suit to foreclose the mortgage, the defendants could plead and successfully defend upon ground that it is void and without consideration. This is a suit in equity and the subject matter and all parties in interest are in court.

After a careful consideration of the numerous questions ably presented by distinguished counsel, we hold that the decree of the lower court should be affirmed without costs to either party.            AFFIRMED.

BENNETT, J., dissents.

HARRIS, J., Dissenting in Part.—I concur in the view that, under the rule established by recognized authorities, the contract made between Delia Hodler and Louis Hodler on January 8, 1915, was, on account of the attending circumstances, in contravention of

public policy. I also concur in the view that the plaintiff is not entitled to any affirmative relief on account of the Tierney note and that she is not entitled to a return of any moneys paid by her to the defendant or to Eliza Stone; but I dissent from the conclusion that the plaintiff is entitled to any affirmative relief whatsoever on account of the $16,000 note and mortgage.

The record presented on this appeal convinces the writer that the litigants are *in pari delicto* and that this result is inevitable under any and every rule by which we are accustomed to gauge and measure human conduct. If the motive which prompted the one to sign the contract was sordid, the motive which prompted the other was equally gross. As the writer views the record the evidence utterly fails to show that the plaintiff acted under duress; but upon the contrary her every act was voluntary, although influenced by motives which are not invulnerable to criticism.

The illegal purpose of the contract of January 8, 1915, was consummated prior to August 8, 1917, the date when this suit was commenced. Not only was the suit for a divorce prosecuted to a decree but also the sum of a thousand dollars agreed to be paid by the plaintiff was actually paid by her, the Tierney note agreed to be transferred by her was in fact transferred and the $16,000 note and mortgage agreed to be executed and delivered by her were in truth made and delivered by her to the defendant; consequently so far as the provisions of the contract of January 8, 1915, are concerned they were executed. It is contended, however, that the contract of January 8th must be deemed to be an executory contract because the $16,000 note remains unpaid. In *Cincinnati, H. & D. R. Co.* v. *McKeen,* 64 Fed. 36, 46 (12 C. C. A. 14, 25), a precedent

in all its essential particulars exactly parallel with the case now under discussion, Mr. Justice HARLAN, when deciding whether a contract providing for a note continued to be an executory contract while the note remained unpaid, said:

"It [the contract] cannot be deemed to have been executory because of the nonpayment of the note for $669,150 prior to the commencement of this suit. The written agreement of June 1, 1887, so far as it related to the balance of the price of the stock sold to Ives, after crediting the cash payments of $250,000 and $639,500, required only the execution and delivery of his note for a specified amount, containing certain provisions, and to be secured by the stock to be delivered to McKeen as collateral."

Neither the plaintiff nor the defendant should be granted any affirmative relief, but the court ought on its own motion to dismiss this suit and leave both parties exactly as the court found them: *Cincinnati H. & D. R. Co.* v. *McKeen,* 64 Fed. 36, 46 (12 C. C. A. 14); *Cullison* v. *Downing,* 42 Or. 377, 383 (71 Pac. 70); *Ah Doon* v. *Smith,* 25 Or. 89, 94 (34 Pac. 1093); *Jackson* v. *Baker,* 48 Or. 155, 157 (85 Pac. 512); *Mitchell* v. *Coach,* 83 Or. 45, 51 (153 Pac. 478, 162 Pac. 1058); 13 C. J. 492, 501, 502.

The fact that the defendant has asked for affirmative relief in nowise alters the rule which ought to be applied in this proceeding. Finding as we do a contract in contravention of public policy and the contract of January 8, 1915, executed so far as concerns the $16,000 note and mortgage, this court ought to dismiss the suit without relief to either party: *Cincinnati H. & D. R. Co.* v. *McKeen,* 64 Fed. 36, 46 (12 C. C. A. 14).

BENSON, J., concurs.

Modified as to costs and rehearing denied February 10, 1920.

ON PETITION FOR REHEARING.

(187 Pac. 604.)

On petition for rehearing, former opinion modified as to costs, otherwise approved and rehearing denied.

MODIFIED AS TO COSTS.   REHEARING DENIED.

*Mr. Edmund B. Tongue* and *Mr. Thomas H. Tongue,* for the petition.

*Mr. Thomas Mannix, Mr. Guy L. Wallace* and *Mr. Frank Schlegel, contra.*

JOHNS, J.—The original agreement known as exhibit "A" was executed on January 8, 1915. This was modified by another writing on January 30, 1915, by which the plaintiff undertook and agreed that she would "at her own cost and expense suitably support and educate and maintain the two minor children of the parties hereto during the minority of such children and during the minority of the younger thereof," and that she would protect ānd save harmless the defendant "from any liability arising out of and because of the signing of any notes or other evidence of indebtedness by said Louis Hodler, in connection with the purchase of any real estate now standing in the name of the said Delia Hodler." On February 1, 1915, the plaintiff executed to the defendant her certain negotiable promissory note for $16,000, payable to his order on or before three years after date, with interest at the rate of 7 per cent per annum. Concurrent therewith and to secure the payment thereof, she executed to him the real mortgage upon the land in Washington County,

the title to which was conveyed to her by her mother. Within a few days after its execution the $16,000 note was indorsed and delivered by Louis Hodler to the defendant Eliza Stone, who became the apparent owner and holder thereof, and to whom the plaintiff paid one year's interest. The complaint in this suit was filed on or about August 8, 1917, and Eliza Stone was made a defendant, for the reason that she claimed to be and apparently was the owner and holder of the note and mortgage. The complaint alleged that while she claimed to be such owner, in truth she was not, and that the note was indorsed without consideration, and that she held it in trust for the use and benefit of the defendant Louis Hodler.

It will be noted that the $16,000 note was dated February 1, 1915, and by its terms became due and payable on or before February 1, 1918; that this suit was commenced on or about August 8, 1917; that Eliza Stone was made a defendant because she was the apparent owner of the note and mortgage, and that to obtain a decree, in addition to all other matters, it was necessary for the plaintiff to allege and prove that the transfer from Louis Hodler to Eliza Stone was without consideration, and that the latter defendant held the note in trust for the use and benefit of Hodler.

Counsel for Louis Hodler now vigorously contend that the Hodlers are *in pari delicto,* and for such reason neither party is entitled to relief, and that the suit should be dismissed.

As we pointed out in the former opinion, the plaintiff does not rely upon the contract or seek to have it enforced. For her cause of suit she alleges that it was executed by her through fear and duress and that it was null and void, as against public policy. In his further and separate answer the defendant Hodler pleaded

that it was a valid and binding contract, and that it was not executed under duress, and he prayed for a decree that it be enforced. Those were the issues upon which the case was tried.

The Circuit Court found that the agreements were executed by the plaintiff under fear and duress, and were void as against public policy, and that the fault of the defendant was greater than that of the plaintiff.

As we construe the record, Delia and Louis Hodler were *in pari delicto* in the execution of the original contract, exhibit "A," and in the proceedings to obtain the decree of divorce. The agreement of January 30, 1915, shows upon its face that it was based upon, is a part and a continuation of the original contract of January 8, 1915. At that time the son Albert was sixteen years old, and Joseph was thirteen. By that instrument it was agreed that the father should be released from any liability for their care, maintenance or education, and that the mother alone should assume all such cares and duties. It appears that one of the boys was then almost a cripple, and in the need of constant care and attention. Although there is no testimony as to the gross amount of such expense until such time as each of them would arrive at the age of majority, it is fair to assume that for the five and eight year periods it would be several thousand dollars, and the question naturally arises, why Louis Hodler should be relieved from that burden and the sole responsibility be thrust upon the mother of his own offspring. As stated in the former opinion, the execution of the agreement of January 30, 1915, by the plaintiff was strong evidence that she was then acting under fear and duress.

Much reliance is placed upon the case of *Cincinnati H. & D. R. Co.* v. *McKeen,* 64 Fed. 36 (12 C. C. A. 14), in which Section 1 of the syllabus reads:

"Where the parties are *in pari delicto,* an executed contract will not, as a general rule, be set aside because of want of authority to make it."

But it further says:

"That the contract had been fully executed; and both parties being equally chargeable with notice of its illegality, and no circumstances of oppression or fraud on defendant's part being established, it would not be set aside, nor would the note be canceled, the illegality of the contract being a complete defense at law, and the note being overdue at the commencement of this suit."

The opinion in that case holds:

"In respect to the prayer for the cancellation of the note given by Ives, there is no need for the interposition of equity, even assuming the contract, in all its parts, to have been illegal and void as beyond the corporate powers of the railroad company. If, at the time this suit was commenced, the company was liable to suit by McKeen, either at law or in equity, upon the note itself, or for its amount as being the balance of the stipulated price for the shares purchased by Ives, trustee, the illegality of that contract would have been a complete defense. Upon the theory that the contract was *ultra vires* of the plaintiff, it may be that a suit in equity might have been maintained for the cancellation of the note, if one had been commenced before the note fell due, and while there was danger of its being transferred to a *bona fide* holder for value, without notice from the note itself or otherwise of the illegality of the contract out of which it arose. But this suit was not brought until after the maturity of the note, and therefore a transfer of it, after the institution of this suit, to a third person, would not have cut off any defense that the railroad company could have made as against McKeen, the payee."

There the note was past due, the illegality of the contract would have been a complete defense in an action at law, and for such reason a court of equity did not

have jurisdiction. In the instant case, the suit was brought before the note became due and payable, when it was in the possession of a third party who was the apparent owner thereof, and to whom the yearly interest had been paid on that assumption. While the Mc-Keen case is authority upon the point for which it was cited in the dissenting opinion of Mr. Justice HARRIS, it is equally good authority for holding that a suit in equity, brought before the maturity of a void note, may be maintained for the cancellation thereof, especially where the note is in the hands of a third party who is the apparent owner and holder, as in the instant case.

Complaint has been made that without any reference to either of them the original opinion overrules the cases of *Henderson* v. *Henderson,* 37 Or. 141 (60 .Pac. 597, 61 Pac. 136, 82 Am. St. Rep. 741, 48 L. R. A. 766), *Ogilvie* v. *Ogilvie,* 37 Or. 171 (61 Pac. 627), and *Ross* v. *Ross,* 21 Or. 9 (26 Pac. 1007). The Ross case cites Section 499 of Hill's Code, now Section 511, L. O. L., which provides that:

"Whenever a marriage shall be declared void or dissolved, the party at whose prayer such decree shall be made shall in all cases be entitled to the undivided third part in his or her individual right in fee of the whole of the real estate owned by the other at the time of such decree, in addition to the further decree for maintenance provided in Section 513; and it shall be the duty of the court in all such cases to enter a decree in accordance with this provision."

It appears that the plaintiff and the defendant, William Ross, were married in Umatilla County on July 9, 1886, and lived together as husband and wife until February 2, 1888, when the wife commenced a suit for divorce in Morrow County, on the grounds of cruel and inhuman treatment, and that a divorce was granted

March 16, 1888, on the grounds alleged in the complaint. At that time the defendant was the owner of a large amount of real property, no reference to which was made in the complaint and of which no disposition was made in the decree. On April 1, 1888, William Ross died intestate, after which the plaintiff brought a suit against his heirs and the administrators of his estate, claiming that as his divorced wife, under the above section of the Code, she was entitled to an undivided one-third interest in all of the real property of William Ross at the time of his death. She alleged that when she brought her suit for divorce she was acting under duress, and for that reason did not set forth in her complaint her claim to the real property. The court found that she was not acting under duress, and that at the time the divorce suit was brought the defendant deposited in a Pendleton bank a deed to her for about 1,200 acres of land, which was delivered to her after the decree was rendered; that in addition thereto she had received other property and money from him to the amount of about $2,000; that she had brought nothing to her husband, and lived with him only about a year and a half, and that for such reason she was estopped to claim an undivided one-third interest in his real property under the terms and provisions of Section 499 of Hill's Code. That was the only point decided in the Ross case.

In the Henderson case the plaintiff was also granted a divorce from the defendant, and by the terms of the decree the defendant was required to support and educate their minor child until the latter reached majority and to pay the plaintiff $150 per month as alimony. The decree was founded upon a written stipulation between the parties, which was embodied in and made a part of the decree. Afterwards the defendant sought

to have the amount of this alimony reduced to $75 per'
month. The plaintiff contended that he should be es-
topped to claim such reduction; that it had been stipu-
lated between them that he should pay $150 per month
to her, and that this agreement had been embodied in
and made a part of the decree. The defendant urged
that the stipulation was void as against public policy,
and the opinion there held:

"It may be stated, generally, that any contract or
agreement between husband and wife, which, by its
terms or effect, is conducive to a relaxation or a sever-
ance of the marital ties, is void, as contrary to public
policy, and will not be upheld or maintained. But
where a separation has been induced, not by collusion,
but by the vicious conduct or disability of one of the
parties, without inducement or fault of the other, and
it has furnished just grounds for legal separation, then
a contract looking to a settlement of property rights
and the proper maintenance of the one not in fault is
in no sense repugnant to public policy."

The court further said:

"When such an agreement has been approved by the
solemn decree of the court, it becomes forever binding,
to the same degree and with like effect as ordinary con-
tracts between parties admittedly *sui juris,* and is not
subject to revocation or modification, except by the con-
sent of the parties thereto."

There the stipulated alimony was to be paid to the
plaintiff, who obtained the decree, by the defendant,
against whom it was rendered.

In *Ogilvie* v. *Ogilvie,* 37 Or. 171 (61 Pac. 627), citing
*Henderson* v. *Henderson,* 37 Or. 141 (60 Pac. 597, 61
Pac. 136, 82 Am. St. Rep. 740, 48 L. R. A. 766), the
opinion says:

"Where a separation has been induced, not by collu-
sion, but by the vicious conduct of one of the parties,

without inducement or fault of the other, and it has furnished just grounds for divorce, then a contract looking to a settlement of the property rights and the proper maintenance of the one not in fault could properly be entered into, as not repugnant to public policy.''

In the instant case it was the plaintiff, and not the defendant Louis Hodler, who obtained a decree of divorce; and by the terms of that decree it was the plaintiff, Delia Hodler, ''at whose prayer'' the decree of divorce was rendered. It was there adjudicated that Louis Hodler was in fault, and that Delia Hodler had just and legal grounds for divorce. He aided and facilitated the obtaining of that decree on the grounds alleged, and Section 511, L. O. L., above quoted, gives an undivided one-third interest in the real property to the party in whose favor the decree is rendered only when that party is not at fault. Here, it is the plaintiff who obtained the decree of divorce, who asked to have the property agreement declared null and void, and the defendant against whom the decree was rendered in an affirmative defense pleads that it is valid and binding.

As he was at fault himself, and his wife had just grounds for a divorce, the defendant Louis Hodler would not have any statutory claim of one third or any interest in her property for compensation as one of the conditions by which she should obtain a divorce.

The decisions in each one of those three cases relied upon by counsel are founded upon the particular facts in each case and there is a marked difference between each of them and the facts in the Hodler case. The original opinion in the Hodler case does not overrule or in any particular modify the opinion of this court in any one of those cases.

On January 8, 1915, Delia Hodler and Louis Hodler entered into a contract by which she was to apply for and obtain a divorce from him upon the grounds of cruel and inhuman treatment, for which after the decree was rendered she was, in legal effect, to pay him $20,000. He aided her in obtaining the divorce on such grounds. At his instance and request the agreement of January 30th was executed, by which she assumed the education, care and maintenance of their two minor children, and he was relieved from any liability therefor. On February 1st, she, in effect, paid him $4,000 in money, and gave him her note secured by a real mortgage on her property, payable on or before three years after date with interest at 7 per cent per annum, and he in turn gave her quitclaim deeds for the real property of which she was the owner and the title to which was in her name. About August 8, 1917, she commenced this suit to cancel the $16,000 note and mortgage upon the grounds that they were obtained under fear and duress and were void as against public policy.

For affirmative answer the defendant pleaded that the agreement was valid; that he relied thereon; that if he had not, he would have contested her divorce and filed a cross-complaint to obtain a divorce from her; that he was always a faithful, kind and loving husband, and that his then wife never had any just grounds for a divorce for cruel and inhuman treatment, or for any other reason; that he had a good and valid defense to her divorce suit, and that in truth and in fact he had a just cause of complaint for a divorce from her, not only upon the grounds of cruel and inhuman treatment but on account of her meretricious relations with Orr. His sworn testimony strongly supports such contentions. His niece, Clara Wenger, was a witness for

Delia Hodler in the divorce suit and gave strong corroborative testimony as to specific acts of cruel and inhuman treatment towards the plaintiff.

As a witness for him in this suit Clara Wenger now testifies that she committed perjury in the divorce suit, and that Hodler was a kind and loving husband. It is upon such a state of facts that the authorities were cited in the original opinion upon which we then held and now hold that the contract between the Hodlers was void as against public policy, and that he was not entitled to enforce payment of the $16,000 note.

It is now vigorously contended that the parties should be left in the same position they were before the suit was filed, and that neither of them should have relief, and numerous decisions of this court are cited to the effect that—

"Whenever it shall develop during a trial that the contract, the subject of the controversy, is fraudulent, the court will of its own motion dismiss the proceeding."

We have no fault to find with the law laid down in those decisions, but we are confronted with the undisputed facts in the Hodler case. The plaintiff, as the moving party, does not seek to enforce a void contract, but to be relieved from it. It is the defendant, Hodler, who as an affirmative defense pleads the validity of the contract and seeks to have it enforced. As pointed out, at the time the suit was brought the $16,000 note was in the possession of a third party who claimed to be its owner, and, while as between the Hodlers the note was void, to protect the plaintiff it was necessary to have that fact established by a decree of court, which cannot be done if the suit is dismissed. Neither was there anything to prevent other and dif-

ferent transfers of the note to other parties, and to prevent that the plaintiff applied for and was granted an injunction restraining the defendants from the further sale or assignment of the note pending suit. It must be conceded that equity would have, and did have, jurisdiction to determine who was the true owner of the note and to prevent its transfer, and that in those particulars the plaintiff would not have complete and adequate remedy at law.

We have examined every Oregon case cited by counsel, and while it is true that, upon the facts stated in each, they lay down the rule of law for which counsel contend, it is also true that there is a material difference between the facts in the Hodler case and any of those cases relied upon, and that no Oregon case can be found where the vital and material facts are similar to those in the Hodler case.

5. The jurisdiction of equity must depend upon the actual facts as they exist at the time the complaint was filed and the relief which is sought to be obtained by both the plaintiff and the defendant, as evidenced by the pleadings. At the time the plaintiff had outstanding and in the hands of a third person, who claimed to be and was apparently the owner, her void negotiable promissory note for $16,000, from which she could only obtain relief in a suit in equity, and to obtain which it was necessary to make, and she did make, the holder of the note a defendant. Here there was not only danger of the note being transferred, but it had actually been transferred to an apparent holder for value. For such reason, under the law laid down in the McKeen case, the suit could be maintained where it was

"commenced before the note fell due, and while there was danger of its being transferred to a *bona fide* holder for value, without notice from the note itself or

otherwise of the illegality of the contract out of which it arose.''

6. After a careful consideration of the able and vigorous petition of counsel for defendant Hodler, for a rehearing, we adhere to our original opinion on the merits.

7. This case has been expensive and was bitterly contested. The transcript was filed in this court by the defendant Hodler. We are advised that it cost $800, and we assume that to be true. The plaintiff also appealed, but there was only one transcript filed in this court. By the former opinion neither party was to have costs. But as the plaintiff had the benefit of the transcript filed by the defendant Louis Hodler, we feel as a matter of justice and equity that she should pay for one half of that transcript. The original decree of this court is therefore modified, and the defendant Louis Hodler is given judgment for costs against the plaintiff, Delia Hodler, for the sum of $400 with interest thereon from December 21, 1918, at the rate of 6 per cent per annum. Otherwise, the original decree of this court is affirmed, and the petition for rehearing is denied.

McBRIDE, C. J., concurs in the opinion.

BEAN and BURNETT, JJ., concur in the result.

BENNETT, J., dissents.

HARRIS, J., Dissenting.—When dissenting from the original opinion, the writer stated that ''the record presented on this appeal convinces the writer that the litigants are *in pari delicto*.'' This statement necessarily involves the idea that both the parties entered into an agreement condemned by the law; and this

statement also necessarily involves the idea that the two parties to the agreement were equally culpable, for such is the meaning of the words *"in pari delicto."* The majority of the court, speaking through Mr. Justice JOHNS, say:

"As we construe the record, Delia and Louis Hodler were *in pari delicto* in the execution of the original contract, exhibit 'A,' and in the proceedings to obtain the decree of divorce."

This is equivalent to saying that the parties entered into an illegal contract, and that in making it one party was just as culpable as the other. If the contract was illegal and the parties were equally guilty, then there is no possible room for saying that Louis Hodler duressed Delia Hodler. If Louis Hodler forced Delia Hodler to sign under duress, then she could not have been *in pari delicto;* and if she was *in pari delicto,* she could not have signed under duress. In the circumstances presented here, the idea that she signed under duress cannot co-exist with the idea that she was *in pari delicto* with the party duressing her. The two ideas cannot exist together, for one completely destroys the other. The suggestion that the writing of January 30, 1915, evidences duress cannot harmonize with the expressed conclusion that the parties are *in pari delicto.*

The case did not come on for trial in the Circuit Court until April, 1918, which was after the maturity of the note, and the decree was not rendered until August 15, 1918.

I am of the opinion that Delia Hodler did not act under duress. I agree with the conclusion that the parties are *in pari delicto;* but I think, for the reasons given when dissenting from the original opinion, that this suit should be dismissed without relief to either

party.  I agree with the conclusion, however, that in any view of the case the plaintiff should be required to pay one half the cost of the transcript of testimony used on the appeal.

BENSON, J., concurs.